## The FIRESTONE TIRE & RUBBER COMPANY, Plaintiff,

v.

## PENSION BENEFIT GUARANTY CORPORATION, et al., Defendants.

### Civ. A. No. 86–3306–OG.

United States District Court, District of Columbia.

Dec. 2, 1988.
As Corrected March 10, 1989.

the Washington area.

## MEMORANDUM

GASCH, District Judge.

This case concerns the proper disposition of the residual assets of a terminated pension plan. Plaintiff Firestone Tire & Rubber Company ("Firestone") challenges the Pension Benefit Guaranty Corporation's ("PBGC") rejection of Firestone's proposed alternative method for calculating how much, if any, of the nine million dollars left in Firestone's terminated pension fund are attributable to employee contributions. Under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* (1982), when participants contribute to a pension plan and the plan is terminated, the residual assets "attributable ... to employee contributions" are to be returned to the employees in a pro rata distribution. 29 U.S.C. § 1344(d)(2). At the time the plan at issue was terminated the statute provided no direction as to how the assets attributable to employee contributions were to be calculated.[1]

In 1984 the PBGC's regulations provided four methods for calculating what portion of residual assets are attributable to employee contributions. 29 C.F.R. 2618.31.

---

1. Section 4044(d) of ERISA, 29 U.S.C. § 1344(d), was amended by the Pension Protection Act in 1987. Pub.L. No. 100–203, § 9302(a), 101 Stat. 1330–33. The amendment adopts almost verbatim one of the methods of calculation contained in the PBGC regulations. *See* 29 C.F.R. § 2618.31(b). It is undisputed that because the plan at issue was terminated in 1984, disposition of its assets is governed by the then-existing version of the statute.

The regulations also allowed a plan administrator to submit for PBGC approval an alternative means of calculating the excess attributable to employee contributions. *Id.* In this case, the PBGC disapproved Firestone's proposed alternative method, which attributed all of the excess assets to Firestone's contributions. Before the Court are cross-motions for summary judgment concerning the propriety of the PBGC's decision. For the reasons set out below, the Court upholds the decision of the PBGC and grants the defendants' motion for summary judgment.

## I. *Background*

There is no dispute as to the essential facts in this case. In 1941 Firestone established the Contributory Retirement Income Fund (the "Contributory Plan"). Administrative Record ("A.R.") at 36. The Contributory Plan provided a fixed level of benefits to its participants and required them to contribute a fixed percentage of their compensation to the Plan. Firestone also contributed to the plan. In 1950 Firestone established another plan, the Non–Contributory Pension Plan for Salaried Employees (the "Non–Contributory Plan"), which was funded entirely by Firestone. A.R. at 72. In 1968 Firestone consolidated the two plans and created the Firestone Tire & Rubber Company Retirement Plan ("the Plan"). A.R. at 38. From 1968 to 1977 the Plan was funded by Firestone and the Plan's participants. In 1977 the Plan was modified to eliminate employee contributions and was funded entirely by Firestone. In August 1984, Firestone filed with the PBGC a notice of intent to terminate the Plan pursuant to section 4041(a) of ERISA, 29 U.S.C. § 1341(a). At that time, Plan assets ($647 million) exceeded liabilities ($363 million) by approximately $284 million. The Plan was terminated in September, 1984. To satisfy the liabilities accrued at the time of termination, Firestone purchased a participating group annuity contract from an insurance company.

In February 1985, Firestone requested the PBGC to approve a proposed alternative method for calculating whether any residual plan assets were attributable to employee contributions. One month later, the PBGC, in an initial determination, rejected Firestone's proposed method. A.R. at 857–58. The PBGC refused to issue a Notice of Sufficiency permitting Firestone to complete the termination process until either a suitable method of calculation was agreed upon or Firestone placed the residual assets in question in escrow pending their final disposition. In April 1985, Firestone placed nine million dollars of excess fund assets in escrow, at which time the PBGC issued a Notice of Sufficiency which permitted the reversion of the remaining $275 million in excess assets to Firestone. A.R. 865–67. The nine million dollar escrowed amount was arrived at by calculating employee contributions by the method set forth in 29 C.F.R. § 2618.31(b), which came to $8,120,895, an amount rounded up to nine million dollars.

Firestone then requested the PBGC to reconsider Firestone's proposed method of calculation. In June 1985, the PBGC denied Firestone's request for reconsideration unless it intended to present new information. After further discussions between the parties, Firestone submitted additional data and analysis in support of its alternative calculation. A.R. at 448–75, 850. When the PBGC had not issued a final determination by December 1986, Firestone filed suit in this Court to compel a decision. In August 1987, the PBGC issued its final determination, disapproving Firestone's proposed alternative method for determining the amount of residual assets attributable to employee contributions. A.R. at 1–13. It is that decision that Firestone challenges in its motion for summary judgment.

## II. *Standard of Review*

The parties agree that the PBGC's determination is subject to judicial review under the Administrative Procedure Act ("APA"). Firestone contends that de novo review is appropriate because there is no factual

matter in dispute, only a question of law.[2] The question of law, in Firestone's view, is how the statutory phrase "assets ... attributable to employee contributions" should be interpreted. *See* 29 U.S.C. § 1344(d)(2). Firestone urges the Court to interpret this statutory language without regard for the PBGC's construction.

███ Questions of statutory construction are decided without deference to agency interpretation when there is congressional intent to be ascertained or the statute is unambiguous on its face. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). When determining whether there is unambiguous congressional intent underlying the statutory provision at issue, courts are "not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history." *Rettig v. PBGC*, 744 F.2d 133, 141 (D.C.Cir.1984). If, however, Congress' intent is not clear, deference should be given to the agency's interpretation of the statute:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, the question is whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter ... If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694. The proper standard of review thus turns on whether Congress provided explicit guidance as to the meaning of the phrase "assets ... attributable to employee contributions."

After reviewing the legislation and the legislative history, the Court concludes that Congress did not clearly express its intent as to how assets were to be attributed to employee contributions. Thus, the question before the Court is whether the PBGC's application of the statute was reasonable. *INS v. Cardozo–Fonseca*, 107 S.Ct. at 1220 n. 29, 1221–22 (quoting *Chevron* 467 U.S. at 845, 104 S.Ct. at 2783). Such deference is especially proper where, as here, "a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2783 (quotations omitted); *see, e.g., Rettig*, 744 F.2d at 141; *Belland v. PBGC*, 726 F.2d 839, 843–45 (D.C.Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984) (noting that the "PBGC's interpretation of ERISA is entitled to great deference"); *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1167–68 (11th Cir.1988) (en banc).

### III. *Analysis*

The root of the controversy in this case is whether the statute mandates that employees receive residual assets in the amount that actual earnings on their contributions exceeded the plan-specified rate of earnings. In a typical contributory plan, and in Firestone's contributory plan, employees contribute a fixed amount of income and receive a prescribed level of benefits upon termination of the plan. This fixed level of benefits ordinarily assumes a set rate of return (specified in the plan) on the employees' contributions. If the actual rate of return exceeds the set rate of return, the question is whether the statute requires that the employees receive the difference. In 1984 the statute simply entitled them to

---

**2.** The parties agree that the essential facts are not in dispute. There is no evidence that the fact finding procedures in the instant case were deficient in any respect; the Administrative Record compiled by the PBGC is nearly one thousand pages long.

the return of assets attributable to employee contributions.

Firestone contends that neither the statute nor the regulations require that employees receive the benefit of a better-than-expected rate of return on contributions. Resolution of that question, in Firestone's view, is left to the terms of the pension plan. In this case, Firestone argues, the Plan provided that upon termination employees would receive only those contributions (plus the fixed rate of return specified in the Plan) that were not expended to provide benefits under the Plan. By Firestone's calculation, none of the residual assets are attributable to employee contributions because all employee contributions were exhausted funding Plan benefits before any Firestone contributions were spent. In short, all employee contributions were spent on liabilities before any Firestone contributions were spent. Under this view, excess assets would be attributable to employee contributions only if the employee contributions over the life of the plan were greater than the liabilities incurred during the course of the plan or owed upon termination.

The PBGC rejected Firestone's proposed calculation and underlying theory on three grounds: it was inconsistent with the statute and regulation, it misconstrued the Plan, and it was insufficiently documented.

A. Construction of the Statute

■ The PBGC employed a three-step analysis in concluding that Firestone's proposed method was precluded by the statute. First, as a general proposition, the legislative history indicates that Congress intended for the statute, not plan terms, to govern the distribution of residual assets. Second, Congress specifically intended for employees to receive a portion of excess assets where the actual rate of return exceeded the expected rate of return. Finally, Firestone's interpretation would render the statutory phrase meaningless because

if employee contributions could be exhausted before any employer contributions were spent, there would never be any residual assets attributable to employee contributions.

The agency's view that the statute trumps any inconsistent Plan terms is not disputed by Firestone. Instead, Firestone contends that spending employee contributions before employer contributions is not inconsistent with the statutory requirement that assets attributable to employee contributions be returned to the employees. In other words, the statute requires that employees share in residual assets only if there are assets attributable to employee contributions; it does not mandate that some portion of assets be attributed to employee contributions.

Firestone relies on *LLC Corp. v. PBGC*, 703 F.2d 301 (8th Cir.1983), for the proposition that it is consistent with 29 U.S.C. § 1344(d)(2) to conclude that none of the residual assets are attributable to employee contributions for the reason that employee contributions were spent first. In *LLC*, the Eighth Circuit allowed the employer to receive all residual assets on the theory that employee contributions and earnings were insufficient to fund all plan benefits. The court held that the PBGC improperly withheld the Notice of Sufficiency upon plan termination.[3] The PBGC contended that a portion of the residual assets should be considered attributable to employee contributions because the plan was a contributory plan with comingled funds.

Firestone argued that the comingling of funds was irrelevant since total liabilities exceeded employee contributions. A certified public accountant hired by Firestone testified "that the residual assets resulted from excess contributions by LLC and did not include any assets attributable to employee contributions." *Id.* at 304. The accountant's conclusion was premised on the theory that the employee contributions and

---

3. In 1976, when the LLC Corp. plan was terminated, the PBGC had not yet adopted regulations implementing 29 U.S.C. § 1344(d). The notice of final regulations were published in the federal register one month before the district

court issued its decision, though the district court was aware that the PBGC's theory was reflected in its proposed regulation. *See LLC*, 537 F.Supp. 355 (E.D.Mo.1981), *rev'd in part and remanded*, 703 F.2d 301 (8th Cir.1983).

actual earnings on those contributions were exhausted before any employer contributions were spent. The court accepted the theory that employee funds were expended first because of what it termed the "differing duties" of the employees and LLC:

> The employees were responsible for the primary pay-in of a fixed percentage and LLC was responsible for contributing the amount above the employee contribution necessary to fund the plan benefits. LLC carried the risk in the plan because the benefits were established. If the plan's investments went sour the company would have to contribute more to fund the benefits than if the investments produced solid earnings. The plan, by making LLC's responsibility variable with the amount necessary to fund the benefits, established that the employees' fixed contributions and earnings should first fund the termination benefits.

*Id.* at 304. The court was not presented with the argument raised by the PBGC in this case—that 29 U.S.C. § 1344(d)(2) precludes the expenditure of all employee funds first because such a method would render the section meaningless.[4]

The PBGC contends that such a plan provision would be inconsistent with 29 U.S.C. § 1344(d)(2) because the statute reflects congressional intent that employees receive the assets resulting from better-than-expected investment earnings. Return of excess to employees would never occur if employee earnings were spent first because "[e]xcept in the rarest of circumstances, employee contributions with earnings will never pay for all accrued benefits. In fact, of the scores of excess assets cases before the agency in its 13–year history, there has been at most one such occurrence, and that involved a very small plan." PBGC's Final Determination Letter, A.R. at 11.

In promulgating the regulations for allocating residual assets between employer and employees, the PBGC has consistently adopted the position that employee contributions cannot be exhausted before employer contributions are spent. In the discussion of the final amendments to the regulations, the PBGC noted that some commentators objected to the proposed regulation on the ground

> that the Act does not require that contributing employees share in 'excess interest' over the rate of interest specified in the plan. PBGC disagrees.... [E]mployer and employee contributions are comingled and are therefore indistinguishable. Thus, they contribute proportionately to any investment income. It follows that employees and employer should share that income proportionately.... With respect to the contention that employees who contribute should be limited to the interest rate provided in the plan, the legislative history of the Act supports a contrary conclusion.

46 Fed.Reg. 49,842, 49,844 (Oct. 8, 1981).

The House and Senate Committees' reports on the 1974 Act did not squarely address the question of whether a plan could spend employee contributions before any employer contributions. But the language of the reports supports the PBGC's view that Congress assumed that liabilities paid by the comingled funds would draw upon employer and employee contributions proportionately. The committees concluded that it would be "unfair to permit the complete recapture by employers of surplus funds in terminated contributory plans, without regard to the fact that contributions by the workers helped generate the surplus." Comm. on Labor and Pub. Welfare, *Retirement Income Security for Employees Act of 1973*, S.Rep. No. 127, 93rd

---

**4.** For this reason alone the Court finds that *LLC* is not dispositive. But other factors lead the Court to conclude that *LLC* is not controlling in the instant case. First, the *LLC* court gave no deference to the PBGC's determination. Second, there was no administrative record compiled by the PBGC and the regulations were not yet in effect. *See supra* note 2. Third, in the instant case the PBGC successfully rebuts the notion that the employer alone assumes the risk of unsuccessful investments. *See infra* note 5. Finally, the PGBC's other grounds for rejecting Firestone's theory in this case—that the various Firestone plans provided that funding of benefits would be shared or paid entirely by Firestone and that there was insufficient documentation—do not hinge on the legal conclusions drawn in *LLC*.

Cong., 1st Sess. 30 (1973); Comm. on Educ. and Labor, Material in the Nature of a Committee Report Explaining H.R. 12906, Cong.Rec. (Feb. 25, 1974) *reprinted in*, Legislative History of the Employee Retirement Income Security Act of 1974, at 616, 3308 ("Legis. Hist.").

Although the Court need not rely on the recent amendments to ERISA, those amendments do make clear that Congress has rejected Firestone's theory. In 1987 Congress amended ERISA by passing the Pension Protection Act ("PPA"), Pub.L. No. 100–203, § 9302(a), 101 Stat. 1330–333. The PPA amends 29 U.S.C. § 1344(d)(2) by utilizing the method previously set out in 29 C.F.R. § 2618.31(b) as the exclusive method for calculating the assets attributable to employee contributions. That method of calculation precludes the theory that no residual assets can be attributed to employee contributions because they were spent first. Moreover, the legislative history explicitly states that "[i]t was intended that participants receive a portion of any residual assets representing the amount, if any, by which the actual earnings on their contributions exceed the interest" rate specified in the plan. Comm. on the Budget, *Omnibus Budget Reconciliation Act of 1987*, H.R.Rep. No. 391, 100th Cong., 1st Sess., pt. 1, at 130, 1987 U.S.Code Cong. & Admin.News pp. 2313–1, 2313–104. Finally, Congress specifically disapproved the holding in *LLC*:

> The Committee expressly rejects the idea (accepted by one court) that the sum of employee contributions and earnings thereon is used first, before any employer contributions, to fund all benefits.... The application of such a rule would mean that, except in the rarest of cases, no portion of the residual assets would ever be distributed to plan participants and beneficiaries. That result was never intended.

H.R.Rep. No. 391, 100th Cong., 1st Sess. pt. 1, at 130. This subsequent congressional action is, of course, not controlling. *Mackey v. Lanier Collections Agency & Serv., Inc.*, — U.S. —, 108 S.Ct. 2182, 2190, 100 L.Ed.2d 836 (1988). Nonetheless, such clearly expressed intent, accompanied by an amendment giving it effect, buttresses the reasonableness of the PBGC's interpretation of the statute. *Bell v. New Jersey*, 461 U.S. 773, 784–85 & n. 12, 103 S.Ct. 2187, 2193–94 & n. 12, 76 L.Ed.2d 312 (1983); *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980). In conclusion, the Court is persuaded that the PBGC's intepretation of the statute is reasonable.

### B. Interpretation of the Plan

■ Even if the statute allowed employee contributions plus interest to be spent before employer contributions, the PBGC concluded that the Firestone plans did not provide that funds would be spent in this way. In fact, the agency pointed to language in a number of the publications related to the various Firestone plans indicating that the employer and employee contributions would be comingled and spent at the same rate. A.R. at 11–13. For example, a booklet published by Firestone in 1964 declares that "[t]he Company's contributions for future service will exceed the contributions to the Plan made by the employees." A.R. at 719. A 1974 booklet provides:

> If your monthly earnings are $900 or under, you will contribute nothing ... You will be automatically included in the Plan and the cost will be borne entirely by the Company.
> If your monthly earnings are over $900, both you and the company share the cost.

A.R. at 833.

Firestone contends that although the practice of spending employee funds first was not explicitly spelled out in the Plan, the way in which employees' and employer contributions were calculated implies that employees' funds were to be spent first. The Plan set employees' contributions at a fixed percentage of salary and Firestone's contributions were an actuarily determined amount designed to provide sufficient Plan funding:

> The employer shall periodically make contributions to the Funding Agent in an amount which, together with Employee

contributions, is sufficient on an actuarial basis approved by the Employer to fund the cost of the Plan.

A.R. at 12. Using the same analysis employed by the *LLC* court, Firestone reasons that because its contributions varied based on the amount actuarially determined to be needed to fund the Plan, the employees' fixed contributions were to be spent first.[5] The PBGC rejected Firestone's view that this method of prescribing contribution obligations implicitly gave rise to an agreement that employee contributions would be spent first. The PBGC noted that it is the custom and practice in the industry to express obligations in this manner, *see* D. McGill, *Fundamentals of Private Pensions*, at 167 (5th ed. 1984), yet it is not the practice for the residual assets of terminated pension funds to be disbursed pursuant to this theory. Moreover, the fact that Firestone's contributions were, as is true of most pension plans, much greater than the employees' contributions belies the contention that Firestone was implicitly obligated to pay only after employee funds were exhausted.[6]

In addition to the absence of Plan language indicating that employee contributions were to be spent first, the variety of plans at issue strongly supports the PBGC's decision. The Contributory Plan and the Non–Contributory Plan were merged in 1968 to form a single contributory plan. In 1977, the Plan became totally non-contributory, funded only by Firestone. Under Firestone's theory, any excess employee contributions present in 1977 were spent before any Firestone contributions, even though the Plan was non-contributory. But the record is devoid of any

suggestion that this fact was communicated to Firestone employees. Moreover, the fact that the Plan was solely funded by Firestone for its last seven years allowed Firestone to reap the benefit of the better-than-expected earnings on the employee contributions accrued prior to 1977. The amount of Firestone's actuarily determined post–1977 contributions was lower due to the pre–1977 excess earnings on employee contributions. In short, any excess attributable to employee contributions that existed in 1977 was spent to fund post–1977 benefits, yet Firestone was solely responsible for contributing to the Plan after 1977. Firestone's contention that this result was implied by the method of calculating contributions is simply untenable.

The presence of specific language in the Firestone plans refuting the notion that employee funds were to be spent first, the absence of any explicit language to support Firestone's interpretation of the Plan, and the failure of Firestone's interpretation to account for the various contribution methods employed by the Plan and its predecessor plans persuade the Court that the PBGC's refusal to approve Firestone's proposed alternative method on the ground that it misinterpreted the Plan was reasonable.

### C. Firestone's Inadequate Documentation

The PBGC determined that even if section 1344(d)(2) and the Plan allowed Firestone to spend the employees' funds first, Firestone did not provide adequate documentation for those periods when the plans were not contributory.[7] The PBGC's inade-

---

5. The corollary to this theory is that because Firestone's contributions were actuarially determined, Firestone bore the risk that earnings would be less than expected. This idea was given great weight by the court in *LLC.* Under this view, if the actual rate of return had been less than the expected rate of return Firestone would have had to make up the difference since it was obligated to contribute an amount sufficient to fund plan benefits. The PBGC noted, however, that employees are not guaranteed all of their accrued plan benefits if plan investments are unsuccessful. *See* 46 Fed.Reg. 49,844 (Oct. 8, 1981). In addition, Firestone benefitted from the better-than-expected earnings because

the unexpected earnings decreased the amount actuarily required to provide sufficient funding.

6. In this case, by Firestone's own calculation, "Firestone's contributions and earnings accounted for nearly 75 percent of the Plan's total assets." Memorandum in Support of Plaintiff's Motion for Summary Judgment, at 23.

7. The theory that employee funds were spent first is inapplicable when the Plan was non-contributory. Obviously employee funds were not implicitly intended to be spent first when all contributions were made by Firestone.

quate documentation rationale is not predicated on its interpretation of the statute and Plan. Even if the Court employed reasoning identical to that employed in *LLC* the PBGC's rationale would withstand judicial scrutiny. Unlike the single plan in *LLC*, the Plan at issue in the instant case has a history of differing funding obligations. For example, the 1941 Contributory Plan and the 1950 Non–Contributory Plan were merged in 1968. Firestone did not document the assets and liabilities of the respective plans. Yet the Contributory Plan could have had excess assets while the Non–Contributory Plan had excess liabilities. As a result, the employee contributions could have been used to offset Firestone contributions owed under the Non–Contributory plan. As noted previously, the same problem is presented by the Plan's change to a non-contributory funding scheme in 1977. Therefore, the Court finds the absence of adequate documentation to be a third, independent reason for refusing to approve Firestone's proposed alternative method.

## ORDER

Upon consideration of the parties' cross-motions for summary judgment, the opposition thereto, the arguments of counsel in open court, and the entire record herein, and for the reasons stated in the accompanying memorandum, it is this 1st day of December, 1988,

ORDERED that defendants' motion for summary judgment be, and hereby is, granted; and it is further

ORDERED that plaintiff's motion for summary judgment be, and hereby is, denied.