**BRIDGESTONE/FIRESTONE, INC., Appellant,**

v.

**PENSION BENEFIT GUARANTY CORPORATION, et al.**

No. 88–7270.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1989.

Decided Dec. 22, 1989.

As Amended Feb. 22, 1990.

Willis J. Goldsmith, with whom Patricia A. Dunn and James E. Anklam, Washington, D.C., were on the brief, for appellant.

Peter H. Gould, Washington, D.C., with whom Carol Connor Flowe and Robert L. Furst were on the brief, for appellees.

Before MIKVA, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This appeal presents the question of whether the pension plan termination provisions of the Employee Retirement Income Security Act of 1974 ("ERISA")[1], prior to its amendment in 1987, allowed an employer to retain all residual assets of an overfunded plan when actual investment earnings on employee contributions exceeded the plan specified interest rate on those contributions. The Pension Benefit Guaranty Corporation ("PBGC"), a United States government corporation that administers and enforces the pension plan termination insurance program designed to guarantee the payment of nonforfeitable pension benefits, promulgated regulations mandating the distribution of such excess earnings to employees and their beneficiaries upon the termination of a contributory defined benefit plan. The district court upheld those regulations on a challenge by Bridgestone/Firestone, Inc. ("Firestone"), and the company now appeals. We agree with the district court that the governing statute is ambiguous and that the PBGC's interpretation of the legislation is reasonable. We therefore affirm.

## I.

An employer sponsored "defined benefit" plan provides a fixed level of retirement benefits to employees, the plan participants. Since the employer must contribute the actuarially determined amounts necessary to fund the benefits promised, the company's periodic contributions to the plan vary with, *inter alia*, the investment performance of plan assets. *See Mead Corp. v. Tilley*, — U.S. —, 109 S.Ct. 2156, 2159, 104 L.Ed.2d 796 (1989); D.

DUNKLE, GUIDE TO PENSION AND PROFIT SHARING PLANS § 1.03, at 1–3 (1989). In a "contributory defined benefit" plan, employees contribute to the funding of their defined benefit plans, typically by contributing a fixed percentage of their salaries. *See, e.g., LLC Corp. v. PBGC,* 703 F.2d 301, 304 (8th Cir.1983). A contributory defined benefit plan usually specifies a rate of return on the employee contributions. These "plan-rate earnings" become part of the employees' accrued benefits, and earnings based on the plan rate are typically less than a plan's "investment earnings," which represent the actual market rate of return on a plan's assets.

In September 1984, Firestone terminated its contributory defined benefit plan. At that time, the Plan assets totalled over $647 million and far exceeded the $363 million in accrued benefits owed to the Plan's participants (the Plan liabilities), creating a surplus of approximately $284 million. Of the $647 million in total assets, about $171 million reflected the employees' contributions and market-level investment earnings on them. The remaining $475 million represented Firestone's contributions and corresponding investment earnings. Thus, the Plan assets derived from the employees' contributions and earnings were insufficient by themselves to satisfy the Plan liabilities. Firestone discharged the Plan liabilities by purchasing with the Plan assets a $397 million group annuity contract from an insurance company.

Firestone then proposed a method of dividing the surplus between the employees and the company that would permit Firestone to retain the entire pool for itself. The PBGC, however, believed that $8.1 million of the surplus (earnings on employee contributions in excess of the plan rate as calculated under PBGC's "presumptive method") were "attributable to employee contributions," within the meaning of section 4044(d)(2) of ERISA, 29 U.S.C. § 1344(d)(2), and therefore Firestone had a statutory duty to return that sum to the employees. Firestone placed $9 million in

1. 29 U.S.C. §§ 1001–1461.

an escrow account pending resolution of the dispute, and the PBGC authorized the reversion of the remainder of the surplus to Firestone.

After the PBGC issued its final determination in August 1987 disallowing Firestone's proposed method of allocating the surplus, Firestone challenged the agency's decision in the district court, claiming that the $9 million in escrow should revert to the employer. The district court granted summary judgment for the PBGC, deferring to the agency's interpretation of ERISA's plan termination provisions. *See Firestone Tire & Rubber Co. v. PBGC*, 701 F.Supp. 836 (D.D.C.1988). The court also concluded that the language of the Plan did not permit Firestone's proposed distribution of surplus assets, *see id.* at 843, and that in any case, Firestone provided inadequate documentation to support its proposed allocation method, *see id.* at 844.

## II.

If "Congress has directly spoken to the precise question at issue," our inquiry ends because we must give effect to the "unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnote omitted). Section 4044 of ERISA, 29 U.S.C. § 1344, outlines the mandatory scheme for the distribution of assets to participants and beneficiaries on the termination of a pension plan covered by Title IV of the Act. The statute categorizes benefit liabilities at the time of termination into a six-tier order of priority. The first and second tiers, the highest in priority, require payment of all accrued benefits derived from the employees' voluntary and mandatory contributions. *See* 29 U.S.C. §§ 1344(a)(1) and (2). Under these provisions, employees must receive all of their contributions plus the plan-rate earnings on those contributions. Next, the third and fourth tiers require the distribution of all

other nonforfeitable benefits that the PBGC guarantees through its pension plan termination insurance program. *See* 29 U.S.C. §§ 1344(a)(3) and (4). Finally, the fifth and sixth tiers provide for the payment of "all other benefits under the plan." *See* 29 U.S.C. §§ 1344(a)(5) and (6).

Under section 4044(d)(1) of the Act, the employer can recover any pension plan assets remaining after the complete satisfaction of the six-tier plan liabilities. However, at the time of the Plan's termination,[2] section 4044(d)(2) added a crucial caveat that is at the core of this controversy:

> Notwithstanding the provisions of paragraph (1), if any assets of the plan attributable to employee contributions, remain after all liabilities of the plan to participants and their beneficiaries have been satisfied, such assets shall be equitably distributed to the employees who made such contributions (or their beneficiaries) in accordance with their rate of contributions.

29 U.S.C. § 1344(d)(2) (1982).

The parties ostensibly dispute whether earnings on employee contributions in excess of the plan rate of interest are "attributable to employee contributions." But that does not actually seem to be the issue because both parties agree that those earnings can be traced to employee contributions, albeit with some imprecision. Instead, Firestone, as we understand appellant, really argues that under a proper construction of section 4044(d)(2), assets attributed to employee contributions (including investment earnings on those funds in excess of the plan rate of interest) should be used first (before any employer contributions or earnings on employer contributions) to satisfy the six-tier plan liabilities— and then, and only then, can there be an assessment as to whether any funds "remain" for distribution to employees. Firestone thus argues that when it purchased the $397 million annuity contract to dis-

---

2. Congress extensively amended section 4044(d)(2) in December 1987. *See* Pension Protection Act of 1987, 29 U.S.C.A. § 1344(d)(2) (West Supp.1988). The 1987 Amendments essentially adopted the position the PBGC takes

before us. It is not disputed however, that the law applicable for this appeal is the pre–1987 version of section 4044(d)(2) in effect at the time of the Plan's termination.

charge the Plan's liabilities, it first expended all $171 million derived from employee contributions and about $225 million attributable to Firestone's contributions (out of the $475 million derived from its contributions). Consequently, none of the assets attributable to employees "remained" to be distributed. Under Firestone's approach, whenever an overfunded plan's liabilities exceed the assets attributable to employees, the employer would receive the entire surplus at termination.

The statute would appear silent as to the *order* of distribution of plan assets—whether plan liabilities are paid first from funds derived from employers or from employees. The PBGC in 1981 adopted regulations detailing the distribution of surplus assets in a contributory defined benefit plan. These regulations allocated to employees a portion of the surplus assets, if any, by which the investment earnings on employee contributions exceed the plan-rate earnings on those funds. *See* 29 C.F.R. § 2618.31. Although these regulations do not specifically state whether employer or employee assets must be exhausted first at termination, by requiring the distribution of excess earnings after the payout of employee contributions and plan rate earnings on them (the tier two liability), the PBGC regulations implicitly mandate the application of employer funds first to satisfy all non-category two plan liabilities. However, to calculate the excess earnings over the plan rate, the PBGC presented employers with the choice of a "presumptive method" and three generally accepted alternative techniques, each of which might produce widely different results for the employer. *See* 29 C.F.R. §§ 2618.31(b) and (c). Of course, the lower the calculation of earnings on employee contributions, the less significant, in bot-

tom line terms, is the PBGC's determination that assets attributed to employer contributions must be exhausted first. In that sense, the PBGC regulations—by permitting a method of calculation resulting in a relatively low rate of actual earnings on employee contributions—might be thought something of a compromise.[3]

Firestone challenges these regulations as inconsistent with both the text and legislative history of the statute. Appellant advances two main arguments in support of its "plain meaning" construction of the statute. First, appellant contends that since section 4044(d)(2) prefaces its distribution to employees with the phrase "*if* any assets ... attributable to employee contributions remain," Congress specifically intended employers to receive all of the surplus in at least some circumstances. Firestone argues that PBGC's position makes the word "if" meaningless because the agency's interpretation implies that employers would never obtain the entire surplus, since it is argued that investment earnings [always?] exceed plan-rate earnings. But at oral argument appellant conceded that if the plan rate were to exceed the investment rate, no distribution would take place under the PBGC's regulation. So by using "if," Congress might well have been envisioning those admittedly rare situations when the plan-rate earnings in fact exceed the investment earnings over the life of the plan, resulting in no distribution to employees even under the PBGC's regulations. Indeed, on occasion the Plan's specified rate of return did exceed the investment performance: the difference between the actual investment rate of return and the plan rate was 15.29% in 1975, –15.76% in 1974, and –7.54% in 1969.[4]

---

3. The "presumptive" method of calculating the excess earnings attributable to Firestone's employees yielded the conservative figure of $8.1 million. Using the other techniques, the figure could have been as high as $79.7 million. Employers may also propose an alternative method, *see* 29 C.F.R. § 2618.31(c), but the PBGC must determine whether the proposal "would equitably determine the amount of the residual attributable to employee contributions and

properly allocate it among the pool of eligible participants and beneficiaries." *Id.*

4. Appellant also argues that the word "remain" implies that Congress permitted employers to exhaust assets attributable to employees, leaving no funds available for distribution to employees. As we have noted, we do not believe the word "remain" carries any meaning as to the order of distribution of plan assets.

Second, appellants argue that in permitting employers under section 4044(a) to allocate the "assets of the Plan" to satisfy the six categories of liabilities, Congress did not limit the definition of "assets," and therefore Congress must have intended employee contributions and earnings as well as employer contributions to be available to pay off plan liabilities. That is of course true, but under the PBGC's interpretation, funds derived from employee contributions are nevertheless "assets of the Plan" which are always available to fund the plan in the event that the other assets are insufficient.

We are therefore unconvinced that Congress directly addressed the question before us in the statutory language, and so we turn to the legislative history of ERISA to see whether Congress there expressed a clear intent on the order of distribution of surplus assets. The genesis of section 4044(d)(2) can be found in section 112(d) of the House version of the bill (H.R. 2). Both appellant and the PBGC agree that the original language of the House bill would have supported the PBGC's interpretation of the statute. It provided for an extra tier, in what is now the six-tier priority structure, that called for the distribution to employees of "any assets remaining after the satisfaction of [plan] liabilities ... which are attributable ... to accumulated investment earnings on employee contributions...." H.R. 2, 93d Cong.2d Sess. § 112(d)(1) (1974), *reprinted in* 3 LEGISLATIVE HISTORY OF THE EMPLOYMENT RETIREMENT INCOME SECURITY ACT OF 1974, at 3960 ("LEGISLATIVE HISTORY"). In other words, it would have treated *all* investment earnings on employee contributions (not just the plan rate earnings, as was true of the bill that passed) as a liability of the plan to be paid out to employees along with their contributions. By converting all investment earnings on employee contributions from assets to liabilities at termination, it settled the question of priority. *See* §§ 112(d)(2) and (d)(3), *reprinted in* 3 LEGISLATIVE HISTORY at 3960–61. The Committee Report accompanying H.R. 2 displays clearly an intent to prevent employers from

gaining the entire plan surplus at termination:

> The Committee believes it is unfair to permit the *complete* recapture by employers of surplus funds in terminated contributory plans, without regard to the fact that contributions by the workers helped to generate the surplus. The Committee ... has concluded that equitable principles require that this particular subject be governed by a specific rule which reflects what the Committee regards as essential protection for the interests of workers in such plans.

H.R. REP. No. 533, 93d Cong., 1st Sess. 12–13, *reprinted in* 2 LEGISLATIVE HISTORY 2359–60 (emphasis added), U.S.Code Cong. & Admin.News 1974, p. 4639.

The Senate version of the bill, S. 4, like the final bill, merely would have returned to the employees "any assets of the fund, attributable to employee contributions, remaining after complete satisfaction of the rights of all beneficiaries accrued to the date of dissolution or termination." S. 4, 93d Cong., 1st Sess. § 510 (1973), *reprinted in* 1 LEGISLATIVE HISTORY at 567. But a March 1974 comparison by the Congressional Research Service between the Senate and House bills did not mention any differences in the meaning of the distribution provisions. *See* 3 LEGISLATIVE HISTORY at 4251–75. Indeed, in describing the distribution of surplus assets provision under S. 4, the Senate Labor Committee Report used the identical passage quoted above from the House Report on H.R. 2. *See* S. REP. No. 127, 93d Cong., 1st Sess. 30 (1973), *reprinted in* 1 LEGISLATIVE HISTORY at 616. The House and Senate Conference Report, which extensively analyzed the Committee's resolution of conflicting language in the two bills, also did not suggest any differences between the two distribution provisions. *See* H.R. CONF.REP. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in* 3 LEGISLATIVE HISTORY at 4277–4654.

Appellant contends that since the bill that emerged from the Conference Committee, and which was ultimately passed into law, more nearly resembled the Senate bill, Congress must have rejected the PBGC's

interpretation. But the absence of the House language in the ultimate legislation does not necessarily support appellant's argument that Congress precluded the PBGC's interpretation. "Because the Conference Committee discussed fully the areas ... where the final version of the statute differed from the predecessor bills," *Mead Corp. v. Tilley*, — U.S. —, 109 S.Ct. 2156, 2162–63, 104 L.Ed.2d 796 (1989), and since the Committee did not mention any differences between the distribution provisions of the final bill and the prior versions, we are not persuaded that Congress specifically intended to reject the distribution scheme proposed in the House bill. The Senate as well as the House apparently did not wish an employer to "complete[ly] recapture" surplus funds generated by employee contributions. By dropping the House provision that converted *all* earnings on employee contributions to liabilities on termination, Congress, moreover, still left open the question as to which pool of assets, those attributable to employer contributions or those attributable to employee contributions, were to be spent first to satisfy liabilities.[5]

Our examination of the text and legislative history of section 4044(d)(2), in sum, convinces us that Congress has not directly spoken to the precise question at issue. And in the absence of such a clear congressional intent, we must proceed to the "*Chevron* Step Two" analysis to determine "whether the agency's answer is based on a *permissible* construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources*

*Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (emphasis added).

### III.

In considering whether the PBGC's interpretation is a "permissible" construction of section 4044(d)(2), we do not reweigh the policies already considered by the agency. *See Rettig v. PBGC*, 744 F.2d 133, 152 (D.C.Cir.1984). As long as the agency's views are consistent with the language and purpose of the statute, we must defer to the agency's interpretation. *See State of Ohio v. United States Dep't of Interior*, 880 F.2d 432, 441 (D.C.Cir.1989); *Continental Air Lines v. Department of Transp.*, 843 F.2d 1444, 1449 (D.C.Cir. 1988); *Rettig*, 744 F.2d at 151–52. Comparing the PBGC's interpretation against this deferential standard, we readily agree with the district court that the agency's view of section 4044(d)(2) is reasonable.

Although section 4044(d)(2) is ambiguous, the actual language of the statute seems more susceptible to the government's construction than Firestone's. As we noted earlier, the crux of this case is the meaning of "remain," and not, as appellant claims, the interpretation of "attributable to employee contributions." The more obvious interpretation of section 4044(d)(2) would require the exhaustion of assets attributable to the *employer* before using employee funds, in order to give full effect to the clause directing distribution of surplus funds to employees. Otherwise, "as-

---

**5.** The PBGC also argues that the 1987 Amendments to section 4044(d)(2), which adopted the agency's "presumptive" calculation method of allocating the surplus, *see* 29 C.F.R. § 2618.31(b), strongly buttresses the agency's view of the statute and its legislative history. In particular, the agency highlights a passage from the House Committee Report accompanying the amendment:

It was intended [in the 1974 Act] that participants receive a portion of any residual assets representing the amount, if any, by which actual earnings on their contributions exceed the interest included in the priority category 2 benefit, rather than using those earnings to fund the remainder of participants' benefits (i.e., the benefits through the sixth priority category).

H.R.Rep. No. 391, 100th Cong., 1st Sess., pt. 1, at 130 (1987), U.S.Code Cong. & Admin.News 1987, pp. 2313–1, 2313–104. However, the pronouncements of a subsequent Congress, here 13 years after the passage of ERISA, are notoriously unreliable indicators of the intent of Congress at the time of passage, and we give very little weight to such revisionist legislative history. *See Mackey v. Lanier Collections Agency & Serv.*, 486 U.S. 825, 108 S.Ct. 2182, 2190, 100 L.Ed.2d 836 (1988); *United Air Lines v. McMann*, 434 U.S. 192, 200 n. 7, 98 S.Ct. 444, 449 n. 7, 54 L.Ed.2d 402 (1977); *International Union v. Brock*, 816 F.2d 761, 767 (D.C.Cir.1987). Similarly, we reject appellant's contention that the 1987 Amendments demonstrate that ERISA, as originally enacted, did not require the PBGC's distribution scheme.

sets attributable to employee contributions" would rarely if ever "remain" after the discharge of liabilities because funds derived from employees' contributions alone are not designed to fully cover those liabilities. "It goes without saying that to find that the agency has embraced the more natural reading of a statute means that the agency's interpretation passes muster under [the textual analysis] of the Step Two inquiry." *Continental Air Lines*, 843 F.2d at 1450.

Firestone nevertheless argues that its interpretation ineluctably flows from the typical method of *funding* contributory defined benefit plans. Because employees contribute a fixed percentage of their salaries but the employer's open-ended contribution varies with the market performance of the plan assets, Firestone contends that the employer bears the entire investment and actuarial risk.[6] Consequently, appellant asserts we must read section 4044(d)(2) as permitting employers to enjoy the "upside" of their risk and to satisfy all plan liabilities first with contributions and earnings attributed to employees, who were not at risk.

We do not see why any particular method of paying into a contributory defined benefit plan necessarily dictates a particular distribution scheme at the plan's termination. Appellant's suggestion that we interpret section 4044(d)(2) based upon a policy judgment of a "fair" allocation of risks and rewards is inconsistent with *Chevron's* command to exercise restraint in reviewing agency construction of statutes. *Chevron* requires federal courts to defer to administrative agencies' statutory interpretations if the resolution of issues requires " 'reconciling conflicting policies' " and when " 'a full understanding of the force of the statutory policy in the given situation ... depend[s] upon more than ordinary knowledge respecting the matters subjected to agency regulations.' " *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2783 (quoting *United*

*States v. Shimer*, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961)). Whether employers should completely recapture the surplus seems a policy question left open by Congress.

To support its "pay in-pay out" argument, Firestone relies heavily on *LLC Corp. v. PBGC*, 703 F.2d 301 (8th Cir.1983), which endorsed Firestone's proposed allocation method. The Eighth Circuit, however, decided *LLC* before the PBGC had promulgated its regulations requiring the distribution to employees of excess earnings and prior to the Supreme Court's decision in *Chevron*. The court did not afford the PBGC's interpretation any deference, *see LLC*, 703 F.2d at 304, and interpreted section 4044(d)(2) apparently with a view to allocate fairly the investment risks and rewards of the pension plan. Nor is it clear that the PBGC presented the same arguments before the Eighth Circuit as it did before this court. In light of the PBGC's interpretative regulations and *Chevron's* reiteration of our obligation to defer to agency determinations of policy legitimately made in the context of statutory construction, we do not consider *LLC* to be persuasive authority and so decline to follow it.

Apart from the compatibility of PBGC's interpretation with the text of the statute, the agency's interpretation also takes account of Congress' concern that employees should not be left out of the distribution of surplus assets when the creation of the surplus was in part due to the employees' contributions. Nothing in the Conference Report indicates a retreat from the clearly expressed desire in *both* the prior House and Senate Committee Reports that employers should not capture those amounts on the termination of a pension plan. But because the funds attributable to employee contributions will rarely be sufficient to discharge plan liabilities, Firestone's interpretation would virtually guarantee that

6. According to Firestone, Congress desired to minimize the risk of inadequate funding of pension plans and consequently sought to maximize the rewards to employers at termination in order to encourage sufficient employer contributions. This suggests, however, that Congress created an incentive to terminate pension plans—a result Congress assuredly did not intend.

employers will always receive the entire surplus in an overfunded plan. The PBGC's requirement for employers to distribute some excess earnings to the employees thus is consistent with the congressional purposes informing the statute.[7]

\* \* \* \* \* \*

Since we conclude that Congress did not directly address the precise issue in 1974 and that the PGBC's interpretation is compatible with the language and purposes of the statute, the judgment of the district court is *Affirmed.*

---

7. Therefore, we need not address the PBGC's arguments that the language of the Plan did not permit Firestone's proposed allocation method and that Firestone had provided inadequate documentation.