**VILLAGE OF PALESTINE, City of Robinson, Willow Hill Grain, Inc., and Patrick W. Simmons, Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Indiana Rail Road Company, Illinois Central Railroad Company, Intervenors.**

No. 90–1418.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 1991.

Decided June 28, 1991.

Gordon P. MacDougall, Washington, D.C., and Frank J. Weber, Robinson, Ill., for petitioners.

Laurence H. Schecker, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, Henri F. Rush, Deputy Gen. Counsel, I.C.C., James F. Rill, Asst. Atty. Gen., John J. Powers, III, and John P. Fonte, Attys., Dept. of Justice, were on the brief, Washington, D.C., for respondents.

John H. Broadley, Washington, D.C., entered an appearance for intervenor, Indiana R.R. Co.

Robert H. Wheeler, Washington, D.C., entered an appearance for intervenor, Illinois Cent. R. Co.

Before SILBERMAN, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Concurring opinion filed by Circuit Judge SILBERMAN.

RANDOLPH, Circuit Judge:

The Village of Palestine and others petition for review of an order of the Interstate Commerce Commission exempting a sale of rail lines and trackage rights from 49 U.S.C. §§ 11343 and 11344(d).[1] The dispute centers on the meaning of 49 U.S.C. § 10505(a), the provision authorizing the Commission to exempt transactions, and the extent to which this provision requires the Commission to evaluate each of the legislative goals collectively designated the "rail transportation policy" (49 U.S.C. § 10101a). Petitioners also challenge the

---

1. In relevant part, section 11343 sets forth the types of transactions that may be subject to Commission regulation:

   (a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may be carried out only with the approval and authorization of the Commission:

   . . . . .

   (2) a purchase, lease, or contract to operate property of another carrier by any number of carriers.

   . . . . .

   (6) acquisition by a rail carrier of trackage rights over ... a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

   Section 11344(d) provides the standards by which transactions set forth in section 11343 are to be judged:

   In a proceeding under this section which does not involve the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall approve such an application unless it finds that—

   (1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

   (2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.

Commission's factual findings made in support of the exemption.

## I

The sale of a rail line or trackage rights between a class I rail carrier and a class II or class III rail carrier normally requires Commission approval after a full-blown proceeding. *See* 49 U.S.C. §§ 11343(a)(2) & (6), 11344(d), 11345.[2] The parties to the sale file an application and the Commission publishes a notice of the transaction in the Federal Register. *Id.* § 11345(a). The public may comment on the application for 30 days after publication of the notice. *Id.* After reviewing the public's comments, the Attorney General and the Secretary of Transportation may choose to intervene as parties to the proceeding. *Id.* § 11345(c)(1). The Commission may order public hearings or require written submissions from the parties. 49 C.F.R. § 1180.4(e). The parties have between 105 days and 24 months to complete this evidentiary process, depending on how the rail carriers involved in the sale are classified. *Id.*

Based on the evidence received, the Commission must approve the sale unless it finds that the transaction will likely have an anticompetitive effect. 49 U.S.C. § 11344(d)(1). If the Commission so finds, it still must approve the sale unless "the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs." *Id.* § 11344(d)(2); *see Illinois v. ICC*, 687 F.2d 1047, 1053 (7th Cir.1982).

The Commission must exempt a transaction otherwise subject to full procedural review under sections 11343 and 11344(d) if two conditions are satisfied. 49 U.S.C. § 10505(a). The first condition is that application of sections 11343 and 11344(d) is not necessary to carry out the "rail transportation policy" of 49 U.S.C. § 10101a, which is reproduced fully in the appendix

to this opinion. 49 U.S.C. § 10505(a)(1). The second is that the sale "is of limited scope," or application of sections 11343 and 11344(d) is not "needed to protect shippers from the abuse of market power." 49 U.S.C. § 10505(a)(2). Obtaining an exemption streamlines the regulatory process by eliminating notice and comment in some cases, by making a hearing unnecessary, and by expediting the final decision. *See* 45 Fed.Reg. 85,180–81 (1980).

This case concerns a petition filed by Indiana Rail Road and Illinois Central on September 28, 1989, for an exemption from sections 11343 and 11344(d). Subject to Commission approval, Illinois Central agreed to sell 90.3 miles of track to Indiana Rail Road. The rail lines are in two segments, one running from Sullivan, Indiana, to Newton, Illinois, the other from Newton to Browns, Illinois. Illinois Central also agreed to sell 16.2 miles of trackage rights along connecting lines. In a separate agreement not at issue here, and subject to Commission approval, Indiana Rail Road agreed to resell the Newton–Browns segment of the line to Garden Spot, a limited partner of Indiana Hi–Rail Corporation. So that Indiana Hi–Rail could operate pending Commission approval of the resale, it negotiated an interim agreement with Indiana Rail Road for assignment of trackage rights over the Newton–Browns segment. With respect to the assignment, Hi–Rail obtained another Commission exemption, the validity of which is not at issue here.

The Commission received 53 comments either opposing or raising concerns about Illinois Central's sale of the rail lines and trackage rights. Many of the commenters, including local and county governments, chambers of commerce, affected railroad employees, and railroad employee organizations, requested a local hearing. While not required to do so, the Commission assigned the exemption petition to an administrative law judge for hearing. The hearing oc-

---

**2.** The ICC has classified rail carriers based on their annual operating revenues. 49 C.F.R. § 1207.1(1). Class I carriers have annual operating revenues of $5 million or more. Class II carriers have annual operating revenues of at

least $1 million but less than $5 million. Class III carriers have operating revenues of less than $1 million. Indiana Rail Road (the purchaser) is a class III carrier and Illinois Central (the seller) is a class I carrier.

curred in Robinson, Illinois, on May 2, 1990; 33 witnesses testified and 11 others submitted written statements. The testimony opposing the transaction focused on Indiana Rail Road's ability to supply sufficient services, the elimination of 19 local railroad jobs, the considerable reduction in pay for those railroad employees who choose to continue working on the rail line under Indiana Rail Road's management, and the impact of a financially unstable railroad on the local economy.

The administrative law judge found, and the Commission later agreed, that the sale would not result in an abuse of market power. 49 U.S.C. § 10505(a)(2)(B). Indiana Rail Road would transport a variety of goods, provide an adequate supply of rail cars for grain shippers, and maintain neutral access to several railroads offering long-haul transportation services. The administrative law judge also found that the transaction would foster rather than hamper competition, one of the central objectives of the rail transportation policy (49 U.S.C. § 10101a(1), (4), (5), & (13)) and section 11344(d). The Commission adopted this finding as well. The administrative law judge decided, however, that exempting the sale from application of sections 11343 and 11344(d) would be inconsistent with other goals stated in the rail transportation policy. He found that the sale would not further fair working conditions (49 U.S.C. § 10101a(12)) and, citing no particular subsection of the policy, that Illinois Central could operate the line better than Indiana Rail Road. On that score, the Commission reversed. It held that the administrative law judge's finding of no anticompetitive effect was enough to satisfy the rail transportation policy in this case.[3]

## II

The principal issue concerns the meaning of section 10505(a)'s command that "the Commission shall exempt ... a transaction ... when the Commission finds that the application of a provision of this subtitle—(1) is not necessary to carry out the transportation policy of section 10101a of this title...." Petitioners misread this language. They say it requires the Commission, in order to grant an exemption, to review the fifteen subsections in section 10101a, determine which might be implicated by the transaction, and make findings that the transaction is consistent with each. But section 10505(a)(1) does not ask whether the "transaction" implements the rail transportation policy. It focuses, as one might expect in a statute aimed at deregulation (*CMC Real Estate Corp. v. ICC*, 807 F.2d 1025, 1031 (D.C.Cir.1986); *see also Central States Motor Freight Bureau, Inc. v. ICC*, 924 F.2d 1099, 1100–01 (D.C. Cir.1991)), on the need for regulation.

Not every provision of the Interstate Commerce Act regulating railroads and the Staggers Rail Act (Pub.L. No. 96–448, 94 Stat. 1895 (1980)) implements each one of section 10101a's many goals. That would be a legislative impossibility. Different means must be employed to accomplish different ends. Section 10505(a)(1) simply assumes that the "provision of this subtitle," whichever it may be, carries out at least some portion of section 10101a's rail transportation policy. Since a section 10505(a) exemption may be granted only from "a provision of this subtitle," rather than from the statute as a whole, *see Illinois Commerce Comm'n v. ICC*, 787 F.2d 616, 627 (D.C.Cir.1986), one must first decide in what respect the "provision" implements the rail transportation policy. Only then can it be determined whether application of the provision is "necessary" to carry out that aspect of the policy in a particular case. Put differently, if a provision does not implement a particular goal set forth in the rail transportation policy, it follows in the language of section 10505(a) that application of the provision is not necessary to carry out that goal. The scope of the Commission's review in an exemption proceeding will therefore be a function of the

---

**3.** While the Commission therefore refused to consider the sale's impact on labor in deciding whether to grant an exemption, it required Illinois Central and Indiana Rail Road to comply with the employee protective conditions set forth in *New York Dock Railway,* 360 I.C.C. 60 (1979).

"relationship between" the "section" from which an exemption is sought and "the national rail transportation policy...." *Brae Corp. v. United States,* 740 F.2d 1023, 1046–47 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985).

Although petitioners believe that *Illinois Commerce Commission,* 787 F.2d at 630–31, supports them, it is far from clear why. The Commission there had granted an exemption from the abandonment provisions (49 U.S.C. §§ 10903, 10904, 10905) for out-of-service rail lines. Without an exemption, a railroad could abandon a line only if the Commission found that this would serve the "public convenience and necessity." 787 F.2d at 621. Many aspects of the rail transportation policy would seem to be carried out by requiring that an abandonment serve the "public convenience and necessity." The court therefore had no occasion to decide whether section 10505(a) required the Commission to consider portions of the rail transportation policy in addition to those implemented by the abandonment provisions. The court did say, however, that only "relevant" or "pertinent" portions of section 10101a's rail transportation policy had to be evaluated (787 F.2d at 629, 630 n. 100, 632), and in a footnote explained that under section 10505(a) the Commission was bound to "study ... the relationship between the statutory provisions ordinarily applicable and the relevant facets of [the rail transportation] policy." 787 F.2d at 630 n. 100. The quoted language is entirely consistent with the Commission's ruling in this case.

Under section 11344(d)(1), the Commission would have been required to approve the sale of these rail lines and trackage rights if there would have been no anticompetitive effect. *Illinois v. ICC,* 687 F.2d 1047, 1053 (7th Cir.1982). The Commission determined, and petitioners do not dispute, that section 11344(d) promoted the goal, stated several times in the rail transportation policy, of ensuring effective competition among rail carriers and other modes of transportation. *See* 49 U.S.C. § 10101a(1), (4), (5) & (13). Accordingly the Commission examined the impact of the proposed sale on competition and, finding no anticompetitive effect, granted the exemption. It considered whether the purchaser would operate an efficient and financially viable railroad only insofar as this affected the purchaser's ability to compete effectively. Over petitioners' objection, it did not consider the effect of the sale on labor to be pertinent to its granting of an exemption from section 11344(d).[4]

If, as petitioners urged, the Commission had made findings about each aspect of the rail transportation policy possibly affected by the sale,[5] the exemption process would have been broader and possibly more onerous than the proceeding from which exemption was sought. Indiana Rail Road could have obtained approval of the sale under section 11344(d)(1) by demonstrating only the absence of anticompetitive effect. The Commission properly rejected petitioners' argument that to obtain an exemption from that provision, Indiana Rail Road also had to establish that the transaction would "encourage fair wages," 49 U.S.C. § 10101a(12), a goal Congress in section 11344(d)(1) did not deem pertinent in regulating the sale of rail lines or trackage rights.

---

**4.** The Commission put it this way: "Section 10505 provides a shortcut analysis to see if regulation—in this case under section 11344(d)—is necessary. If section 11344(d) does not require review of particular issues, neither does the section 10505 process.... [S]ection 11344(d) does not include the effects on employees as a decisional criteria.... (Rather, for section 11344(d) transactions, such concerns are addressed only through the protective conditions required by section 11347.)." Finance Docket Nos. 31472 & 31485, *Indiana Rail Road Co.—Petition for Exemption—Illinois Central Railroad Co.,* served Aug. 7, 1990, slip op. at 3, 5.

The railroads here did not seek an exemption from § 11347 and the Commission determined that the employees were protected "by the imposition of the standard labor protective provisions." Slip op. at 6.

**5.** Section 10505(a) does not say that the Commission may merely consider or contemplate or study the rail transportation policy; the Commission is required to grant an exemption only when it "finds" that application of the provision from which exemption is sought is not necessary.

Citing *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), petitioners charge that the Commission's interpretation is an unexplained departure from its practice. The Commission's decisions suggest the opposite. Whenever the Commission has considered *how* to decide whether "application of a provision of this subtitle is necessary to carry out the rail transportation policy," it has adopted the same approach as here.[6]

Petitioners cite no cases in which the Commission has denied an exemption based on some goal of the rail transportation policy not carried out by the statutory provision from which the exemption was sought. Instead, they point to decisions in which the Commission explained its grant of an exemption in the following terms or something similar: "an exemption will expedite regulatory decisions and reduce regulatory barriers to entry [49 U.S.C. § 10101a(2) & (7)]; and foster sound economic conditions and encourage efficient management [49 U.S.C. § 10101a(5) and (10)]. Other aspects of the rail transportation policy are not affected adversely."[7] Such statements suggest that the Commission looked at each aspect of section 10101a, but we do not believe they represent any settled practice on the Commission's part. From all that appears, the exemptions were granted in these cases without opposition; no issue regarding the proper interpretation of section 10505(a) was raised or discussed; and the transactions seemed to be inconsequential. The Commission's general observations about the rail transportation policy did not purport to reflect any considered course of decisionmaking and we will not treat them as such, particularly since the Commission, when directly confronted with the issue

presented here, resolved it in a manner consistent with its decision in this proceeding.

■ While we therefore conclude that the Commission properly interpreted section 10505(a), the question remains whether the Commission's finding that the sale would not have an anticompetitive effect should be upheld. Petitioners' argument before the Commission was that the transaction would result in certain restrictions and surcharges on the shipment of goods that "do not allow, to the maximum extent possible, competition and demand for services to set reasonable rates." *See* 49 U.S.C. § 10101a(1). The Commission found otherwise and its conclusion is amply supported by the evidence. *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). The Commission adopted the detailed factual findings of the administrative law judge, who carefully considered the evidence and found that grain shippers would have more transportation options after the sale while other shippers would be unaffected by the transaction.

### III

Petitioners also challenge the Commission's findings that the sale is "of limited scope" and that application of section 11344(d) is "not needed to protect shippers from the abuse of market power." Under section 10505(a)(2) only one of these conditions must be established to obtain an exemption. We agree with the Commission that both are present in this case.

■ As to the limited scope finding, petitioners contend that "[d]istance alone cannot be the sole guide." Perhaps so, but distance was not the Commission's only

**6.** Finance Docket No. 31643, *United Transp. Union v. Southern Pacific Transp. Co.* (unpublished), served Nov. 5, 1990, slip op. at 5; Finance Docket No. 31610, *Chicago West Pullman Corp.—Control Exemption—Iowa Interstate R.R. Ltd.* (unpublished), served Oct. 30, 1990, slip op. at 3; *Blackstone Capital Partners, L.P.—Control Exemption—CNW Corp.,* 5 I.C.C. 1015, 1019 (1989), *aff'd sub nom. Brotherhood of Railway Carmen v. ICC,* 917 F.2d 1136 (8th Cir.1990).

**7.** *See, e.g.,* Finance Docket No. 31356, *Kansas City Southern Ry.—Control Exemption—Joplin Union Depot Co.* (unpublished), served Feb. 6, 1989; Finance Docket No. 31280, *Norfolk & Western Ry.—Control Exemption—Des Moines Union Ry.* (unpublished), served Sept. 12, 1988; Finance Docket No. 31264, *KKR Associates—Control Exemption—Brockway Realty Corp.* (unpublished), served July 26, 1986.

guide. While the Commission relied on the relatively short length of track subject to sale, which is surely important, the Commission added that the transaction was to be consummated without the issuance of new securities or the restructuring of rail operations, either of which presumably would broaden its scope.

■ In regard to the issue of market abuse, petitioners misunderstand the basis for the Commission's decision. Believing that the administrative law judge's finding of no market abuse was based on the contemplated resale of part of the rail line to Indiana Hi-Rail, they complain about the Commission's treatment of resale as an unrelated matter subject to future review. The Commission's finding, however, rests on a different basis. Relying on the testimony of Thomas Hoback, president of Indiana Rail Road, the Commission found that Indiana Rail Road could interchange traffic with six long-haul carriers, thereby providing rail access to new markets, and would furnish an adequate supply of rail cars. Petitioners raise no bottleneck claim, and indeed no reason appears why any bottleneck problems on the line would be aggravated by the change in ownership. The Commission therefore properly found no reason to doubt Indiana Rail Road's assurance that it would be responsive to the shippers' needs on the newly-acquired lines.

The Commission correctly interpreted section 10505(a). Its findings are supported by substantial evidence. The petition for review is therefore denied.

### APPENDIX

§ 10101a. *Rail transportation policy.*

In regulating the railroad industry, it is the policy of the United States Government—

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

(7) to reduce regulatory barriers to entry into and exit from the industry;

(8) to operate transportation facilities and equipment without detriment to the public health and safety;

(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;

(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;

(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;

(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;

(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintain-

ing the capability of providing such information; and

(15) to encourage and promote energy conservation.

SILBERMAN, Circuit Judge, concurring:

The majority opinion is quite ambiguous as to whether the Commission's interpretation of the statute is affirmed because it is a permissible construction or because it is the only acceptable construction. The majority does not even mention *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the governing Supreme Court case dictating the manner in which the judiciary must review agency construction of their authorizing legislation. I write separately, then, to explain why the majority opinion must not, indeed could not, be interpreted as *holding* more than that the Commission's interpretation is a permissible one. The Commission should not be barred in the future from adopting another, more pro-regulatory, interpretation of the ICC's exemption authority, perhaps more sympathetic to the interest of affected workers.

The key provision in dispute is § 10505. (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10505(a).

This provision, by using the word "shall," imposes an obligation on the Commission to provide the exemption if the requisite criteria are met. But at least on its face subsection (1) leaves the Commission with a broad discretion to determine whether an application of a provision is necessary to carry out "the Railroad Transportation Policy" (RTP), which is a "wish list" of imprecisely drafted, overlapping, and somewhat contradictory policy goals. The language of § 10505(a) does not even purport to limit the Commission as to which of these 15 goals is to be considered when the Commission decides whether to grant an exemption from the requirements of a particular section of the statute. We have previously said that the Commission need not "address each and every one of the policy's fifteen components, for some *may be completely unrelated* to the exemption. It does mean, however, that the Commission must consider all aspects of the policy *bearing* on the propriety of the exemption," *Illinois Commerce Comm'n v. ICC*, 787 F.2d 616, 627 (D.C.Cir.1986) (emphasis added; footnotes omitted). In that case we reversed and remanded the ICC's rules expediting abandonment proceedings for failure to consider several RTP factors the court thought "relevant" to the exemption. *Id.* at 632. We did not suggest that RTP factors were relevant in an exemption determination only if they were directly and specifically implicated in the underlying regulatory provision. Indeed, the tone, if not the holding of our opinion, as the language quoted above indicates, suggests that the Commission should be inclusive rather than exclusive in determining RTP factors to be considered in exemption determinations—which is, of course, why petitioners rely so heavily on that opinion. In our case, however, the Commission in granting the exemption declined to consider any RTP factor that it thought was *not* subsumed or directly implicated in the underlying substantive provision, § 11344 from which the exemption was sought.

That provision reads as follows:
(d) In a proceeding under this section which does not involve the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall approve such an application unless it finds that—

(1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

(2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.

49 U.S.C. § 11344(d).

Petitioners argued that the Commission cannot properly limit its scope of inquiry or consideration of RTP factors to ask only whether the proposed exemption would serve competition—and particularly that the Commission should consider RTP factor (12) instructing the Commission "to encourage fair wages and safe and suitable working conditions in the railroad industry."

The ALJ did just as petitioners asked. He believed that the Commission can deny the exemption because of "one factor, for example, the effect on working conditions" and recommended the denial because: "I believe that the Commission should conclude that the subject transaction has no substantial purpose other than employee removal and deny the application on the basis of a breach of the [RTP]." *ALJ Initial Decision* (ALJ I.D.) at 20. The ALJ was obviously referring to § 10101a(12).[1] The ICC reversed, but it is extremely important to note carefully what the Commission said and did not say. The Commission reasoned that:

> Under section 11344, Congress has limited the Commission's jurisdiction to consideration of whether a transaction would have a substantial adverse impact on competition. If the Commission finds no substantial adverse impact it must approve the transaction. Accordingly, our analysis in the exemption context *need not* be broadened beyond consideration of those aspects of the RTP that deal with competition. We *need not* look at RTP issues unrelated to the purpose of section 11344. The RTP criteria must

be analyzed, but in a way that does not subject the applicable factors to a higher level of scrutiny than would apply in the context of a formal application.

Finance Docket Nos. 31,472 & 31,485, *Indiana Rail Road Co.—Petition for Exemption—Illinois Cent. R.R. Co.*, served Aug. 7, 1990, at 3 (ICC Decision) (footnote omitted) (emphases added).

Thus the Commission did not say that the statute *must* be interpreted to preclude the Commission "in the exemption context" from considering RTP factors which arguably do not directly bear on the criteria used in the substantive statutory provision. The Commission was content to hold that under its reading of the statute it was not obliged to consider RTP factors other than those subsumed within section 11344. Although section 11344 requires consideration of the public interest (which would certainly encompass all of the RTP factors) the Commission is to do so only if it finds that a proposed transaction is anticompetitive. Under a full-blown section 11344 proceeding, once the Commission finds that a transaction is pro-competitive it must stop its inquiry and approve the merger. Therefore, the Commission reasons that in applying section 10505(a), the exemption provision to section 11344, its deliberations should parallel the process called for in section 11344 itself. The Commission, accordingly, should not even consider factors that do not directly bear on competition when determining whether an exemption should be granted. "The RTP criteria must be analyzed, but in a way that does not subject the applicable factors to a higher level of scrutiny than would apply in the context of a formal application." ICC Decision at 3. By "higher level of scrutiny" the Commission evidently means taking into account a broader number of factors. That seems to me a quite reasonable construction of the statutory language but it is hardly inevitable.

Although the majority describes the petitioners as asking that the Commission

---

1. The ALJ also considered evidence relating to yet another RTP factor concerning the safety of railroad operations, 49 U.S.C. § 10101a(8). He determined, however, that safety is not threatened by this transaction. *See* ALJ I.D. at 16.

make a "finding" as to the other than competitive factors, that is not quite accurate. The petitioners asked only that the Commission consider other RTP factors before it "finds" that "the application of [the Interstate Commerce Act] is not necessary." I can well imagine another Commission, perhaps less committed to deregulation, reasonably interpreting the two sections of the statute as permitting the Commission to consider, at least briefly, factors other than those focusing on enhancing competition when determining whether to grant an exception under § 10505(a) from § 11344. Such a future Commission might well reason that it is permitted under § 11344 to ignore the public interest only if it determines after the full-blown procedures of that section that a proposed transaction will have no anticompetitive effect. Because without the full procedures the Commission may have less confidence in its own determination of the proposed transaction's impact on competition, it might well wish to take a quick look at the other public interest factors, namely the RTP factors, before granting an exemption.

Certainly there is nothing in the express language of the statute which limits the Commission's authority to take such an approach. As I said earlier, Congress was completely silent as to RTP factors to be considered by the Commission with respect to any given exemption request. No one has suggested any legislative history that would reveal a specific intent on the point. Moreover, the RTP factors are hardly precisely drafted and are not mutually exclusive. The Commission never even specified which of these factors were directly relevant in this case. The majority only deduces that the Commission meant to refer to section 10101a(1), (4), (5) and (13). Indeed, the language of section 10505(a) might actually be thought to point more to petitioners' construction than the Commission's. It will be recalled that the exemption provi-

sion has two criteria which must be applied, and the second includes the language "the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power." 49 U.S.C. § 10505(a)(2)(B). Certainly that concept is at the core of any concerns about competitiveness. The criterion that the statutory section from which an exemption is granted "is not necessary to carry out the transportation policy of section 10101a," was not intended to be limited to competitiveness concerns.

In sum, the issue presented to us by petitioners—whether the Commission must consider more than competitiveness factors in approving an exemption from section 11344—is a paradigm *Chevron* "Step II" issue. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782; *General Motors Corp. v. NHTSA*, 898 F.2d 165, 169 (D.C.Cir.1990); *Bridgestone/Firestone v. Pension Benefit Guar. Corp.*, 892 F.2d 105, 110–11 (D.C. Cir.1989). Congress has not directly addressed the question and so we must defer to any reasonable agency interpretation. Particularly since the agency in its opinion claimed only that it was not required by the statute to consider more than it did, it would be astonishingly inappropriate for us to say or even imply that the Commission could not have considered other factors if it wished.

Whatever may be the Commission's general authority under section 10505 to consider RTP factors not concerning competitiveness when considering a grant of an exemption from § 11344, the real issue is this case centers on the Commission's rejection of the ALJ's concern for the impact of the proposed transaction on employees.[2] And here I think the majority misunderstands both the relationship between § 11344 and § 11347 and the Commission's decision. It is simply not so that the Commission must authorize a transaction under

2. We have before us as one of the petitioners the omnipresent Patrick W. Simmons, the Legislative Director of the United Transportation Union (UTU). We have previously noted that Simmons does not have standing personally. *United Transp. Union v. ICC*, 891 F.2d 908, 909 n. 1 (D.C.Cir.1989), *cert. denied*, ⸺ U.S. ⸺, 110

S.Ct. 3271, 111 L.Ed.2d 781 (1990). Only the UTU, as the representative of affected workers, has standing, but nonetheless Simmons continues to petition and file briefs in his own name. After reading far too many of these briefs, I have concluded that the captions of these petitions is the least of the union's concerns.

§ 11344 if only the two criteria set forth in that section are met. Section 11347 imposes another separate condition:

> When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565).

49 U.S.C. § 11347.

It is undeniable that § 11347 labor protective provisions directly implicate the fair wages and suitable working conditions goal of the Railroad Transportation Policy. To be sure, as the majority notes, the Commission required that the so-called *New York Dock* protective provisions be applied, providing employees with a level of protection that the Commission traditionally imposes in approving a § 11344 transaction, but that is hardly the point. The point is that even following the majority's own logic section 10101a(12) is just as relevant to the Commission's consideration of this exemption as sections 10101a(4), (5), and (13) because the Commission *must* consider the transaction's impact on employees in the "full-blown" § 11344 proceedings.

The Commission, as I read its opinion, understood the point; it did not say that it need not (let alone must not) consider section 10101a(12) in granting the exemption. Instead, it said that:

> finally we note that the only RTP provision dealing with rail labor (section 10101a(12)) refers to "fair wages and safe and suitable working conditions" ... the wages of the affected IC employees [15] are protected by the imposition of standard labor protection provisions.

[15] As the ALJ noted, although 19 IC employees' jobs are affected by these transactions, only one position will be abolished, with the other 18 employees reassigned to other comparable positions in IC's system. Moreover, IRRC's op-

erations over the line will require 7 additional employees.

ICC Decision at 6. In other words, the Commission did consider the very factor that petitioners claim it should have. The Commission might well have weighed that factor differently and disapproved the exemption (as the ALJ recommended) and I seriously doubt that we would have any cause to disapprove such a decision.

Paradoxically, the majority is defending the Commission for not doing what it actually did. The Commission did say that under the *regular* 11344(d) procedure labor concerns are addressed not in that subsection but rather in section 11347, *see* Maj.Op. at n. 4; but the Commission decidedly did not say that it was not permitted to consider labor concerns when determining whether to grant an exemption to 11344(d). And it most assuredly did not say, as does the majority at the end of n. 4, that the "railroads here did not seek an exemption from § 11347," implying that by seeking an exemption from 11344(d) alone the railroad could break the statutory link between sections 11344 and 11347. That may be a possible interpretation, but it is not one the Commission adopted.

For all the above reasons, I think it is rather obvious that the court's holding on the issue of statutory interpretation must be read as limited to affirming a permissible construction and application of the statute. Surely it would be unfortunate if the court's opinion were read as differing with the Commission and holding that the Commission was obliged to construe the statute as precluding the approach taken by the ALJ regarding the impact on workers (or indeed the actual construction followed by the Commission). In *Chevron* the Supreme Court admonished this court not to prevent an agency wishing to relax regulation from interpreting undefined and imprecise statutory language. It would be a cruel twist if we were now to violate *Chevron's* principles to freeze present *deregulatory* efforts against the possibility that future appointees of commissions like the ICC would

come to office with a different political and economic agenda.