Jack R. HOLLAND, George Rush, Truman Manning, Henry D. Zobell, Plaintiffs–Appellees and Cross–Appellants,

v.

VALHI INCORPORATED, a Delaware corporation; Harold Simmons, Trustee, Defendants and Cross–Appellees,

and

The Amalgamated Sugar Company, a Utah corporation; The Amalgamated Sugar Company Retirement Plan Committee, Defendants–Appellants and Cross–Appellees.

Jack R. HOLLAND, George E. Rush, Truman Manning, Henry D. Zobell, Plaintiffs–Appellants,

v.

VALHI INCORPORATED, a Delaware corporation; The Amalgamated Sugar Company, a Utah corporation; The Amalgamated Sugar Company Retirement Plan Committee; Harold Simmons, Trustee, Defendants–Appellees.

Nos. 92–4049, 92–4054 and 92–4183.

United States Court of Appeals, Tenth Circuit.

April 19, 1994.

Order Denying Rehearing and Suggestion for Rehearing En Banc June 13, 1994.

Jean Reed Haynes (Thomas E. Dutton with her on the brief), of Kirkland & Ellis, Chicago, IL (James S. Jardine and A. Robert Thorup of Ray, Quinney & Nebeker, Salt Lake City, UT, with her on the brief), for defendants-appellants/cross-appellees (Nos. 92–4049, 92–4054) and for defendants-appellees (No. 92–4183).

Claudia F. Berry (Brent R. Armstrong, Stewart M. Hanson, Jr., and Fred R. Silvester with her on the brief), of Suitter, Axland, Armstrong & Hanson, Salt Lake City, UT, for plaintiffs-appellees/cross-appellants (Nos. 92–4049, 92–4054) and for plaintiffs-appellants (No. 92–4183).

Before TACHA, SETH and BRIGHT,[*] Circuit Judges.

BRIGHT, Senior Circuit Judge.

The Amalgamated Sugar Company made an arrangement in 1986 for the excess funds in its pension plan for non-bargaining employees to be paid to the employer and a small amount of the reversion to be paid to its retirees. This was to be accomplished by what is termed a "spin-off termination" in which Amalgamated used contributions to the plans to purchase annuities to fund future obligations under the pension plans. Under a spinoff termination, excess funds are to be paid to the employer and the employees who had contributed to those funds. A spin-off arrangement and determination of splitting the residual funds between employer and retiree contributors call for very complicated accounting and actuarial calculations. In this case, the employee class (collectively referred to as "Retirees") objected to the allocation of the residual funds and brought this action under ERISA § 502, 29 U.S.C. § 1132, against the defendants, The Amalgamated Sugar Company and The Amalgamated Sugar Company Retirement Plan Com-

---

[*] The Honorable Myron H. Bright, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

mittee (collectively referred to as "Amalgamated"), asserting that defendants violated their fiduciary duties to the former employees under the plan. The district court[1] 787 F.Supp. 996 made findings in favor of the plaintiffs and increased substantially the class share of residual funds from the spinoff and awarded costs and attorney's fees. Both sides appeal.

In Amalgamated's appeal, these defendants assert compliance with the governing law and regulations and seek dismissal of the action and non-liability for fees and costs.

The plaintiffs-retirees seek all of the residuary funds plus an increase in attorney's fees and reimbursement for actual expenses of expert witnesses.

We affirm the district court's determination of Amalgamated's right to a reversion upon termination of the Retirees' Plan, but reverse and remand for redetermination of the amount of that reversionary interest.

## I. BACKGROUND

Amalgamated began offering its employees an opportunity to participate in a defined retirement plan in 1953.[2] Section 14.4 of the 1953 Plan provided for "Distribution Upon Termination" as follows:

> If after satisfaction of all liabilities with respect to members, retired members, former members, and joint annuitants under the Plan, there is a balance remaining due to erroneous actuarial computation, the balance shall be paid by the Trustee to the Company.

Amendments to the 1953 Plan which would adversely affect plan members required a consenting vote of at least 75% of the members. 1953 Plan § 13.2.

Amalgamated amended the 1953 Plan in both 1970 and 1976, resulting in both the deletion of the clause requiring consent of at least 75% of all plan members for adoption of adverse amendments, and replacement and update as to any reversion clause. These changes are not relevant to this appeal.

Plan amendments eliminated employee contributions in 1980. Participants under the 1976 Plan who had retired prior to October 1, 1980, did not, however, receive any refund of employee contributions, whereas participants who were active employees as of that date received a refund of all prior contributions and interest at the rate provided by the Plan. Of the plaintiff class, forty-five participants or their beneficiaries received a refund pursuant to the 1980 Amendments.

A surplus in the pension plan arose in 1981 due to higher than expected returns on investments and a change in the interest rate assumptions. The 1976 or Non–Bargaining Plan, as amended, was split into two plans in 1986, one for active and deferred vested participants who were not yet receiving benefits (Continuing Salaried Plan), and another for retired employees who were receiving plan benefits as of July 1, 1986 (Retirees' Plan). Amalgamated created the two separate plans to implement a spinoff termination, which would allow Amalgamated to recoup excess assets.[3] Amalgamated terminated the Retirees' Plan effective August 11, 1986, as we have observed; the reversion of surplus assets to Amalgamated following the termination is the subject of the present lawsuit.

As of December 1, 1986, the value of assets in the Continuing Salaried Plan equaled $21,594,005.00. Amalgamated had purchased an annuity for the Continuing Salaried Plan for $7,745,300.00 to cover accrued benefit liabili-

---

**1.** The Honorable J. Thomas Greene, United States District Judge, United States District Court for the District of Utah–Central Division.

**2.** A defined retirement plan refers to one "which determines benefits by a participant's years of service and age," 70 C.J.S. *Pensions* § 13 (1987); *see also* ERISA § 3(35), 29 U.S.C. § 1002(35), and if "qualified" under 26 U.S.C. § 401 *et seq.*, is subject to favorable Internal Revenue Service treatment.

**3.** Under a spinoff-termination the existing plan is split into two plans, one covering the

retirees and one covering the active employees. The active plan has sufficient assets transferred to it to fund accrued benefits and the balance is allocated to the retirees' plan. The retirees' plan, which has thereby been allocated the excess assets is then terminated, with the employer recovering the excess.
David B. Tatge, *Preparing for Excess Asset Reversions on Termination of Defined–Benefit Plans*, 63 J. Tax'n 20, 24 (July 1985) (footnote with citation omitted).

ties calculated on a termination basis. Amalgamated then transferred the balance of $13,848,705.00 to the Retirees' Plan; a second annuity was then purchased reflecting the liability under the Retirees' Plan, $8,472,200.00, resulting in surplus or residual assets of $5,376,505.00 in the Retirees' Plan.[4]

Amalgamated retained the services of an accounting firm, Coopers & Lybrand, to implement the spinoff termination. Amalgamated directed the accounting firm to assume that no employee assets remained in the Retirees' Plan. Coopers & Lybrand thus assumed that none of the Retirees' Plan participants were entitled to any portion of the residual assets. Amalgamated's contribution to the Retirees' Plan equaled $9,443,452.09, whereas employee contributions to that plan totaled $3,031,839.11. Pursuant to the 1980 Amendments, $536,746.17 had been refunded to forty-five members of the retirees class or their beneficiaries.[5] *Amalgamated treated the monies for these refunds as derived from employee contributions, not from contributions made by both employer and employee, thus directly reducing the employees' share of contributions remaining in the fund.*

Coopers & Lybrand applied 29 C.F.R. § 2618.31(b)[6] of the Pension Benefit Guaranty Corporation's (PBGC)[7] regulations, in accordance with its interpretation thereof, to determine the portion of the Retirees' Plan's residual assets attributable to employee contributions. In performing the "presumptive method" calculation required under the statute, Coopers & Lybrand treated the entire plan as terminated in order to account for and distribute any residual assets attributable to contributions made by participants of both plans. Findings of Fact and Conclusions of Law, p. 18, ¶ 49 (1/12/92) [hereinafter "Findings and Conclusions"].[8]

---

**4.** In its Order dated September 10, 1990 denying both parties' motions for summary judgment, the district court stated that the residual or surplus assets equaled $5,365,177.00. The difference between the residual figures, as stated in the January 13, 1992 "Findings of Fact and Conclusions of Law" and the September 10, 1990 Order, equals $11,328.00. This difference apparently resulted from the district court's use of $13,837,377.00 as the remaining balance following purchase of the first annuity, but does not alter our analysis of the issues raised on appeal.

**5.** Amalgamated later determined that two members of the retirees' class, and one person in the Continuing Salaried Plan, were entitled to receive a reversion. Amalgamated paid the amounts so determined.

**6.** 29 C.F.R. § 2618.31(b) (1986) provides as follows:

Unless an alternative method of computation is approved by PBGC pursuant to paragraphs (c) and (d) of this section, the portion of residual assets attributable to employee contributions shall be computed by multiplying the total residual assets by a fraction—

(1) The numerator of which is the present value of all benefits assigned to priority category 2, pursuant to § 2618.12 [participants' accrued benefits derived from mandatory employee contributions]; and

(2) The denominator of which is the present value of all benefits assigned to priority categories 2 through 6, pursuant to §§ 2618.12 through 2618.16.

*See also* ERISA § 4044(d)(3)(B), 29 U.S.C. § 1344(d)(3)(B) (as amended in 1987).

**7.** The PBGC is a United States corporation established within the Department of Labor under 29 U.S.C. § 1302 to administer the mandatory pension plan termination insurance program of Title IV of ERISA. *See* § 1302(a). The PBGC "guarantees benefits which are nonforfeitable [e.g., vested], except benefits which become nonforfeitable solely on account of plan termination." 70 C.J.S. *Pensions* § 118 (1987).

**8.** The district court's findings of fact on Amalgamated's application of the presumptive method are as follows:

**Present value of accrued benefits derived from mandatory employee contributions (priority category 2) =**

$63,119.48 (24,768.43 [retirees'] + 38,351.05 [actives'])

"This numerator amount was determined by totalling, for each participant, the contributions he/she had made to the Plan, plus the Plan rate of interest, and then reducing that amount by benefit payments which had been made to each such participant prior to the date of Plan termination." Findings and Conclusions, p. 18, ¶ 50.

Four retired employees of Amalgamated, representing a certified class of 157 similarly situated Amalgamated retirees, brought this action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. (1985), against Amalgamated, The Amalgamated Sugar Company Retirement Plan Committee (Plan Committee), Valhi, Inc., and Harold Simmons.[9] Retirees challenged Amalgamated's right to a reversion, as well as the amount of that reversion.

At the conclusion of the bench trial, the district court found that under the terms of § 14.4 of the 1953 Plan, Amalgamated was entitled to a reversion of residual assets due to "erroneous actuarial computation."[10] However, the district court reasoned that Amalgamated's use of the presumptive method resulted in an inequitable distribution of the residual assets attributable to employee contributions thereby constituting a breach of fiduciary duty. Specifically, the district court stated:

> Defendants Amalgamated and the Committee acted solely in the interest of the

**Present value of benefit obligations of both Retirees' Plan and Continuing Salaried Plan calculated on termination basis (priority categories 2–6) =**

$17,594,691.00

**Total residual assets =**

$5,376,505.00

**Total residual assets attributable to employee contributions =**

$5,376,505.00 × $\dfrac{\$63,119.48}{\$17,594,691.00}$ = $18,817.00 (actually $18,901.03, whereas adding Retirees' portion and Actives' portion equals $18,817.77).

**Retirees' ratio:**

$\dfrac{\$24,768.43}{\$17,594,691.00}$ = .0014

**Retirees' portion:**

$5,376,505.00 × .0014 = $7,547.00

(actually $7,527.11)

**Actives' ratio:**

$\dfrac{\$38,351.05}{\$17,594,691.00}$ = .0021

**Actives' portion:**

$5,376,505.00 × .0021 = $11,290.00

(actually $11,290.66)

Findings and Conclusions, pp. 18–19, ¶¶ 50–51. The district court rejected the ultimate conclusions.

without causing a violation of the non-diversion rule. . . .

Similarly, when fixed and contingent liabilities are discharged through the purchase of a contract or contracts from an insurance company which provides the benefits with respect to individuals for whom the liabilities are determined, the remaining assets may be considered surplus arising from actuarial error and revert to the employer.

See also *International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Dyneer Corp.*, 747 F.2d 335, 337 (6th Cir.1984); *Washington–Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 555 F.Supp. 257 (D.D.C. 1983), *aff'd*, 729 F.2d 863 (D.C.Cir.1984); *In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd*, 582 F.2d 1273 (3d Cir. 1978).

9. Valhi is the surviving entity following the merger of Amalgamated into LLC Corporation. Simmons is trustee of all outstanding stock of Contran Corporation, which held approximately 90% of Valhi's outstanding stock. Simmons also is Chairman of the Board of Amalgamated, Valhi and Contran, and is the beneficial owner of most of the stock of these companies. During the course of the trial Valhi was dismissed as a party, and the court found in favor of Simmons on the ground that he did not exercise any discretionary control in respect to the termination.

10. Internal Revenue Service Rev.Rul. 83–52, 1983 C.B. 87, defines "actuarial error" as follows:

[A]fter cash distributions have been made to the participants in this plan in amounts equal to the present value . . . of their total benefits, any remaining assets (i.e., those resulting from actuarial error) may revert to the employer

sponsoring employer, Amalgamated, and themselves, without regard for and without any attempt to determine, the rights and interests of the participants and beneficiaries to whom their fiduciary duties ran.

Given the fact that the presumptive method calculations undertaken by defendants resulted in an allocation to Plan participants of .0015% of the residual assets when these same participants had made approximately 25% of the contributions to the Plan, defendants had a fiduciary duty under ERISA to consider alternative methods for calculating an equitable portion of the residual assets attributable to employee contributions and, if necessary, seek approval from the PBGC to utilize this alternative method. Defendants violated both ERISA and section 14.4 of the 1953 Plan by assuming that they were entitled to recoup all residual assets.

11. ERISA § 4044(d)(2), 29 U.S.C. § 1344(d)(2) provides as follows:

> Notwithstanding the provisions of paragraph (1), if any assets of the plan attributable to employee contributions, remain after all liabilities of the plan to participants and their beneficiaries have been satisfied, such assets shall be *equitably distributed* to the employees who made such contributions (or their beneficiaries) in accordance with their rate of contributions.

(Emphasis added).

12. The district court based its calculations as follows:

> The numerator of the fraction in the method adopted by the court represents the present value of the Retirees' accumulated employee contributions. The Retirees' accumulated employee contributions is calculated by determining at the date of retirement each employee's mandatory employee contributions under the Plan, along with the earnings on those contributions at the actual earned rate. This figure is compared to the present value of the individual's total retirement benefits at the date of retirement so that for each Retiree it is possible to know what percentage of the individual's total retirement benefits is exclusively due to employee contributions.
>
> The next step is to recalculate the present value of retirement benefits at the date of Plan termination. (The present value of retirement benefits at the date of Plan termination is decreased to the extent of pension benefits paid out under the Plan.) This new figure for the present value of total benefits is then multiplied by the same percentage arrived at above, resulting in proportionately reduced present value of accumulated employee benefits for

Even though Amalgamated's pension plan had been non-contributory since the 1980 Amendment, Amalgamated was still required to comply with ERISA § 4044(d)(2) [29 U.S.C. § 1344(d)(2) ]. Amalgamated's right to any residual assets which arose due to erroneous actuarial computation is limited by the provisions of ERISA § 4044(d)(2) [29 U.S.C. § 1344(d)(2) ] [11].

Findings and Conclusions, pp. 24–25, ¶¶ 10–12. Exercising its "equitable powers," the district court recalculated the amount attributable to employee contributions,[12] and concluded that Amalgamated improperly received $915,679.00 in residual assets.[13]

After entering judgment in the amount of $915,679.00 plus interest in plaintiffs' favor on February 25, 1992, the district court fixed attorney's fees and ruled on the issue of expert witness costs. The court adopted the

each Retiree. Adding together each Retiree's accumulated employee contributions at the date of Plan termination provides the figure used in the numerator. That figure is $1,454,838.92.

The denominator of the fraction adopted by the court is the present value of total benefits provided under the Retirees' Plan. The best evidence of this is the actual purchase price of the annuity purchased ... by defendants to pay the costs of these benefits. Accordingly, the figure used in the denominator is $8,472,200.00.

Application of the court's method to determine residual assets attributable to employee contributions results in the following calculation:

To calculate Retirees' percentage contribution to the Plan:

$$\frac{\$1,454,839.00}{\$8,472,200.00} = 17.17\%$$

To calculate Retirees' portion of the residual assets:

$$17.17\% \times \$5,376,505.00 = \$923,146.00$$

Findings and Conclusions, pp. 26–27, ¶¶ 16–18.

13. The district court reached this figure as follows: $923,146.00 (district court's calculation of Retirees' portion of residual assets) − $7,527.00 (Amalgamated's calculation of reversion to Retirees) = $915,679.00 [actually $915,619.00.] Findings and Conclusions, p. 27, ¶ 19. The correct figure is as follows: $923,146.00 (Retirees' portion of residual assets) − $7,527.11 (amount of prior reversion actually due Retirees ($5,376,505.00 × .0014)) = $915,618.89 (residual assets still due Retirees).

reasonable hourly rate for attorney's fees as that charged in comparable cases in the jurisdiction of the district court, and denied plaintiffs' request for $59,243.76 in costs incurred for expert witnesses. Retirees challenge both these rulings, as well as the district court's ruling that Amalgamated had a right to residual assets and the amount thereunder. Amalgamated argues that, because it complied with the PBGC's presumptive method, the district court erroneously concluded that Amalgamated breached its fiduciary duty to Retirees.

## II. DISCUSSION

### A. Existence of a Reversionary Interest

■ Plaintiffs' cross-appeal challenges Amalgamated's right to a reversion. We address this issue first, for if Amalgamated did not have the right to a reversion, then the claim of error pertaining to the district court's determination of the residual asset distribution must fail.

Plaintiffs assert that Amalgamated failed to comply with the 1953 Plan provision requiring a 75% vote of all members in favor of an amendment that would "prejudice, impair or adversely affect any right of any member acquired by or vested in him...." 1953 Plan § 13.2. Plaintiffs also argue that the 1953 Plan did not provide for a reversion to the employer.

The district court correctly rejected plaintiffs' allegation of error. ERISA authorizes a reversion to an employer who complies with the specified criteria. Specifically, residual assets of a single-employer plan may be distributed to the employer if

A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

B) the distribution does not contravene any provision of law, and

C) the plan provides for such a distribution in these circumstances.

ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1).

The district court concluded that Amalgamated satisfied all its liabilities, and that the reversion did not violate any provision of law. The court further concluded that the 1953 Plan, § 14.4, provided for distribution of residual assets due to erroneous actuarial computation upon termination of the plan. We will not disturb the district court's determination on this issue; plaintiffs' conclusory allegations of intentional overfunding and wrongful adjustment of the benefit formula are insufficient to establish that the surplus was wrongfully obtained and thus not subject to reversion. Accordingly, as provided in § 14.4, the 1953 Plan entitled Amalgamated to any residual assets resulting from erroneous actuarial computation.

### B. Calculation of the Reversionary Interest

We turn now to the district court's rejection of Amalgamated's calculation of its reversion and the consequential determination that Amalgamated breached its fiduciary duty to plaintiffs.

ERISA governs the creation, maintenance and termination of qualifying employee benefit plans. ERISA § 2, 29 U.S.C. § 1001 et seq. The primary purpose of ERISA is to protect individual pension rights. ERISA § 2, 29 U.S.C. § 1001; House Report On Employee Retirement Income Security Act of 1974, H.R.Rep. No. 93–533, 93rd Cong., 2d Sess. 3 (1974), reprinted in 1974 U.S.C.C.A.N. 4639. Accordingly, the employer shall not benefit from plan assets except as provided by ERISA. ERISA § 403(c), 29 U.S.C. § 1103(c).

■ An employer may, however, receive residual assets if three conditions are satisfied. ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1) (set out, supra, at p. 974). Notwithstanding this provision, excess assets attributable to employee contributions must be equitably distributed to the employees who made such contributions, or their beneficiaries, in accordance with their rate of contributions. ERISA § 4044(d)(2), 29 U.S.C. § 1344(d)(2). See Bridgestone/Firestone, Inc. v. Pension Ben. Guar. Corp., 892 F.2d 105, 107 (D.C.Cir.1989).

The PBGC prescribes the manner in which assets attributable to employee contributions are determined. 29 C.F.R. § 2618.31. Sub-

section (b) of the regulation provides as follows:

> Unless an alternative method of computation is approved by PBGC pursuant to paragraphs (c) and (d) of this section, the portion of residual assets attributable to employee contributions shall be computed by multiplying the total residual assets by a fraction—
>
> (1) The numerator of which is the present value of all benefits assigned to priority category 2, pursuant to § 2618.12; and
>
> (2) The denominator of which is the present value of all benefits assigned to priority categories 2 through 6, pursuant to §§ 2618.12 through 2618.16.

(Emphasis added).[14]

In the present litigation, a key issue is whether Amalgamated's method of calculating excess assets attributable to mandatory employee contributions, assertedly the presumptive method, is in fact that specifically authorized and required by the Pension Benefit Guaranty Corporation in the absence of an approved alternative method. While the district court's findings indicate an assumption that Amalgamated followed the presumptive method under the PBGC regulations, this assertion is disputed by the plaintiffs. We conclude from the record that Amalgamated failed to give due consideration to the intent of the statute and the underlying regulations in computing the Retirees' share. Amalgamated failed to establish that

its computation, in fact, was consistent with the requirement of the regulations.

In *Bridgestone/Firestone*, the question presented was whether assets attributed to employee contributions should be used first to satisfy plan liabilities such that an employer could retain all residual assets of an overfunded plan when the actual investment earnings on employee contributions exceeded the plan-specified interest rate on those contributions. 892 F.2d at 106. In that case the court upheld the PBGC regulations against the employer's contention that it was entitled to the full residue. The discussion in *Bridgestone/Firestone* explaining § 2618.31 of the regulation, the dispute between the employer and employees and the PBGC is instructive:

> Firestone then proposed a method of dividing the surplus between the employees and the company that would permit Firestone to retain the entire pool for itself. The PBGC, however, believed that $8.1 million of the surplus (earnings on employee contributions in excess of the plan rate as calculated under PBGC's 'presumptive method') were 'attributable to employee contributions,' within the meaning of section 4044(d)(2) of ERISA, 29 U.S.C. § 1344(d)(2), and therefore Firestone had a statutory duty to return that sum to the employees.
>
> . . . .
>
> The parties ostensibly dispute whether earnings on employee contributions in ex-

14. Examples of alternative methods for calculating excess assets attributable to employee contributions, as provided by 29 C.F.R. § 2618.31(c), are as follows:

(1) Determine the amount attributable to employee contributions, based on the difference between employee contributions to the plan, minus withdrawals and distributions, credited with actual earnings for each plan year, and the value of the benefits assigned to priority category 2, pursuant to §§ 2618.10 and 2618.12.

(2) Determine the amount attributable to employee contributions, but not in excess of total residual assets, by multiplying total plan assets by a fraction, the numerator of which is total employee contributions to the plan, minus withdrawals and distributions, and the denominator of which is the sum of such employee contributions and all employer contributions to the plan, with all contributions accumulated at the interest rate or rates used in the plan's

actuarial assumptions, and subtracting the total assets allocated to priority category 2, pursuant to §§ 2618.10 and 2618.12.

(3) Determine the amount attributable to employee contributions by multiplying total residual assets by a fraction, the numerator of which is total employee contributions to the plan, minus withdrawals and distributions, and the denominator of which is the sum of such employee contributions and all employer contributions to the plan.

An employer's proposal of an alternative method for determining residual assets pursuant to 29 C.F.R. § 2618(c) necessitates that the PBGC determine whether the proposal " 'would equitably determine the amount of the residual attributable to employee contributions and properly allocate it among the pool of eligible participants and beneficiaries.' " *Bridgestone/Firestone, Inc. v. Pension Ben. Guar. Corp.*, 892 F.2d 105, 108 n. 3 (D.C.Cir.1989).

cess of the plan rate of interest are 'attributable to employee contributions.' But that does not actually seem to be the issue because both parties agree that those earnings can be traced to employee contributions, albeit with some imprecision. Instead, Firestone, as we understand appellant, really argues that under a proper construction of section 4044(d)(2), assets attributed to employee contributions (including investment earnings on those funds in excess of the plan rate of interest) should be used first (before any employer contributions or earnings on employer contributions) to satisfy the six-tier [priority category] plan liabilities—and then, and only then, can there be an assessment as to whether any funds 'remain' for distribution to employees. Firestone thus argues that when it purchased the $397 million annuity contract to discharge the Plan's liabilities, it first expended all $171 million derived from employee contributions and about $225 million attributable to Firestone's contributions (out of the $475 million derived from its contributions). Consequently, none of the assets attributable to employees 'remained' to be distributed. Under Firestone's approach, whenever an overfunded plan's liabilities exceed the assets attributable to employees, the employer would receive the entire surplus at termination.

The statute would appear silent as to the *order* of distribution of plan assets—whether plan liabilities are paid first from funds derived from employers or from employees. The PBGC in 1981 adopted regulations detailing the distribution of surplus assets in a contributory defined benefit plan. These regulations allocated to employees a portion of the surplus assets, if any, by which the investment earnings on employee contributions exceed the plan-rate earnings on those funds. *See* 29 C.F.R. § 2618.31. Although these regulations do not specifically state whether employer or employee assets must be exhausted first at termination, by requiring the distribution of excess earnings after the payout of employee contributions and plan rate earnings on them (the tier two

[priority category 2] liability), the PBGC regulations implicitly mandate the application of employer funds first to satisfy all non-category two plan liabilities. However, to calculate the excess earnings over the plan rate, the PBGC presented employers with the choice of a 'presumptive method' and three generally accepted alternative techniques, each of which might produce widely different results for the employer. *See* 29 C.F.R. §§ 2618.31(b) and (c). Of course, the lower the calculation of earnings on employee contributions, the less significant, in bottom line terms, is the PBGC's determination that assets attributed to employer contributions must be exhausted first. In that sense, the PBGC regulations—by permitting a method of calculation resulting in a relatively low rate of actual earnings on employee contributions—might be thought something of a compromise.

*Bridgestone/Firestone,* 892 F.2d at 106–08 (emphasis in original) (citations and footnotes omitted).

From our reading of the statute, regulations and *Bridgestone/Firestone*, we come to the following conclusions:[15] (1) in determining the order of payout to satisfy priority category 2 plan liabilities, i.e., individual accrued benefits derived from participant's mandatory contributions (29 C.F.R. § 2618.-12; *see also* ERISA § 4044(a)(2), 29 U.S.C. § 1344(a)(2)), no regulation requires, permits or directs that the employees' mandatory contributions be paid out first to satisfy priority category 2 pension benefits; (2) the *Bridgestone/Firestone* case seems to imply that in determining assets attributable to employee contributions, actual earnings on those funds should be used to the extent they can be computed; and (3) that the manipulation of statistical data produces widely varying results in the division of the residue.

The heart of Amalgamated's position on appeal is that its accountants and actuaries fully complied with the PBGC regulations. If that contention is correct, Amalgamated asserts it is entitled to a reversal of the trial court's decision and the adoption of Amal-

15. We limit our discussion to spinoff terminations.

gamated's computation of the amount to be paid to Retirees.

Here the district court found that a portion of the residual assets resulted from employee contributions. Findings and Conclusions, p. 25, ¶ 14. Notwithstanding its finding that Amalgamated, through its actuary, followed the PBGC's presumptive method set forth in § 2618.31(b), *see supra*, at pp. 971–72, n. 8, the district court rejected the express language of § 2618.31(b), concluding instead that "[t]he presumptive method need not be followed when its application results in an inequitable distribution." Findings and Conclusions, p. 25, ¶ 15.

On the question whether Amalgamated followed the PBGC's presumptive method, we turn to the calculation of the fraction's numerator as specified by the PBGC regulations. The regulation applicable at the time of the spinoff termination, 29 C.F.R. § 2618.31(b) (1985), reads in pertinent part:

> [T]he portion of residual assets attributable to employee contributions shall be computed by multiplying the total residual assets by a fraction—(1) The numerator of which is the present value of all benefits assigned to priority category 2, pursuant to section 2618.12; . . . .

"Accumulated mandatory employee contributions," as defined by 29 C.F.R. § 2618.-12(b)(1), equals "the participant's total nonforfeitable mandatory employee contributions remaining in the plan on the date of plan termination plus interest, if any, under the plan provisions."

Under the method employed by Amalgamated, two matters are in serious dispute: (1) the remaining amount of employee contributions subsequent to implementation of the 1980 Amendment providing for the return of employee contributions, and (2) the applicable interest rate.

### (1) Return of Employee Contributions

■ Amalgamated subtracted all amounts that had been paid out to Retirees from the employee contributions made during the pe-

riod in question. Retirees, their actuary and the district court rejected that approach and subtracted from Retirees' contributions only a proportional share of the amount, attributing the prior payments before the Plan had been terminated as coming from funds attributable to both Amalgamated and the employees. The district court accepted the latter computation in determining the numerator of the fraction for purposes of allocating the residual assets. We now examine Amalgamated's authority for its subtraction of all Retiree payments (priority category 2) as coming first, and thus solely from Retirees' employee contributions.

In deducting all benefit payments made to Retirees wholly from the employees' contributions, Amalgamated's experts did not rely on any express regulation but only on an interpretation given them from their lawyers and from certain technical service groups. Allegedly one of their lawyers discussed this interpretation with the PBGC. Inquiring of the expert witness Lee Joseph Trad as to whether the PBGC confirmed Amalgamated's interpretation, the witness responded "I believe they did, yes." Appellants' and Cross–Appellees' Supp.App. at 45.

Amalgamated's interpretation of the presumptive method is not supported by any regulation and in many respects seems to run counter to practical accounting. When a reserve fund is set aside for the payments of future retiree benefits and that fund includes monies paid in by both employer and employees, and when the monies are paid out, then the payments are derived from this common fund of the employer and employees. This is an important aspect of this case—indeed, a crucial one.

Although the portion of the regulation which we have quoted above (29 C.F.R. § 2618.31(b) (1985)) does not specifically require a deduction of the employee contributions, experts for both sides and the district court assumed that such deduction should be made in computing the numerator and we would agree a deduction should be made.[16] The question remains—out of whose funds?

---

16. We think it is significant that the examples of alternative methods of allocating the residue, set forth in 29 C.F.R. § 2618.31(c), provide for re- ducing the amount of the numerator by the amount distributed and withdrawn.

The most reasonable resolution is the one advanced by the plaintiffs—out of the combined funds of both employer and employee contributions. The court adopted this methodology in determining the remaining employee funds in residue to compute the numerator of the fraction.

We find support for this interpretation in the legislative history of the 1987 amendments to ERISA:

> As under current law, the first step in distributing any residual assets is to determine and distribute that portion of the residual that is attributable to mandatory employee contributions. The Committee notes that there will virtually always be a distribution to participants and beneficiaries under this rule in plans requiring employee contributions. *The Committee expressly rejects the idea* (accepted by one court) *that the sum of employee contributions and earnings thereon is used first, before any employer contributions, to fund all benefits described in the allocation rules under subsection (a) of ERISA section 4044* [29 U.S.C. § 1344(a) ]. The application of such a rule would mean that, except in the rarest of cases, no portion of the residual assets would ever be distributed to plan participants and beneficiaries. *That result was never intended.* Under section 4044(a) and the regulations thereunder, a benefit equal to an employee's mandatory contributions (less withdrawals by and distributions to that employee) with interest at the plan's rate is allocated to the second priority category. It was intended that participants receive a portion of any residual assets representing the amount, if any, by which actual earnings on their contributions exceed the interest included in the priority category 2 benefit, rather than using those earnings to fund the remainder of participants' benefits (i.e., the benefits through the sixth priority category).

H.R.Rep. No. 391(I), 100th Cong., 1st Sess. 130, *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–105 (emphasis added).

Accordingly then, calculation of the numerator used to determine residual assets attributable to employee contributions requires al-locating withdrawals and distributions proportionately between employee and employer contributions. At least in the absence of a regulation presented to the trial court, the trial court was entitled to adopt this method. Amalgamated's computation of the numerator for the purpose of allocating the residual assets is, therefore, flawed.

### (2) Applicable Rate of Interest

■ The second area of controversy pertinent to computing the employees' contributions remaining in the fund is application of the appropriate interest rate.

Amalgamated, relying on § 2618.12(b)(1) and (2) of the regulation, asserted that the plan rate of interest be used in calculating accumulated mandatory employee contributions for each participant. That section provides that plan interest rates "shall be used to convert a participant's accumulated mandatory contributions to the annuity form of benefit," and seems to apply to the computation of the residual assets attributable to employee contributions in § 2618.31. Plaintiffs' expert and the court utilized the actual interest rate. The latter enhanced the fund.

As we have noted, *Bridgestone/Firestone* seems to indicate that earnings on employee contributions in excess of the plan rate of interest may be attributable to employee contributions. 892 F.2d at 107. On this issue, Retirees contend that the actual rate of interest on the contributed funds should apply, citing a House Committee Report accompanying the amendment to ERISA § 4044(d) in the 1987 Congress. That statement follows:

> It was intended [at the time ERISA was enacted] that participants receive a portion of any residual assets representing the amount, if any, *by which actual earnings on their contributions exceeded the interest included in the priority category 2 benefit,* rather than using those earnings to fund the remainder of participants' benefits (i.e., the benefits through the sixth priority category).

H.R.Rep. No. 391(I), 100th Cong., 1st Sess. 130, *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–105 (emphasis added).

As the findings indicate, the district court rejected application of the interest rate specified by PBGC, the plan rate, and applied the actual rate of interest to these earnings. While this may seem equitable, we cannot say, in light of the regulations in effect at the time of the spinoff, that Amalgamated violated this portion of the regulation in its computation.

Based upon the foregoing discussion, we cannot sustain the district court's computation of the portion of residual assets attributable to employee contributions. While the district court properly determined the necessity of allocating withdrawals and distributions proportionately between employee and employer contributions, the allocation of the residue amount to Retirees as computed by the district court does not take into account the contributions to that residue by the active employees participating in the Continuing Salaried Plan. *See supra*, p. 973, n. 12. No regulation authorizes that a portion of the residue derived from non-retiree contributions be paid to retirees. Amalgamated would reserve this amount to the contributions of active employees. We see no error in such allocation. Further, the trial court, adopting the view of plaintiffs' expert witness, erroneously applied the actual rate of interest, rather than the plan rate as dictated by the regulations. 29 C.F.R. § 2618.-12(b)(1) and (2). Consequently, further proceedings are necessary for redetermination of those residual assets solely attributable to mandatory employee contributions by Retirees.[17]

### C. Expert Witness Costs

■ Plaintiffs contend they were entitled to an award of expert fees, $59,243.76, for services rendered by their actuary expert as a matter of law. According to Retirees, 29 U.S.C. § 1132(g) permits the award of expert fees interpreted in light of the Civil Rights Act of 1991, specifically, 42 U.S.C. § 1988. Retirees reason that because Congress rejected the rationale of *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), where the Supreme Court did not allow an award of expert fees in the context of the Civil Rights Act of 1964, and Congress knows that federal courts rely upon analysis analogous to the Civil Rights Act in interpreting attorney and expert fee awards pursuant to similar federal statutes, Congress must have intended that *West Virginia University Hospitals* not apply in expert fee award cases under ERISA. Furthermore, enactment of § 1988 of the 1991 Civil Rights Act which legislatively overturned *West Virginia University Hospitals*, demonstrates the right to recover expert fees. Retirees argue that this provision should be applied retroactively to this case, as the amendment is procedural and does not affect substantive rights.

We disagree. The district court did not err as a matter of law in not awarding plaintiff class expert witness fees. The fee shifting provision of ERISA, 29 U.S.C. § 1132(g), authorizes that the district court, in its discretion, "may allow a reasonable attorney's fee and costs of action to either party." But absent a specific statutory provision, an award of expert fees must be based on 28 U.S.C. §§ 1821 and 1920, *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987), limiting the amount to $40 a day. *See also Hull by Hull v. United States*, 978 F.2d 570, 573 (10th Cir.1992) (fee shifting provision of Federal Torts Claims Act, 28 U.S.C. § 2412,

---

**17.** Calculation of the denominator used to determine residual assets attributable to employee contributions presents the same controversy as that found with calculating the numerator, based on the remaining amount of employee contributions subsequent to implementation of the 1980 Amendment providing for the return of employee contributions. This is so because the regulation applicable at the time of the spinoff termination, 29 C.F.R. § 2618.31(b) (1985), also requires determination of priority category 2 benefits. The regulation reads in pertinent part:

[T]he portion of residual assets attributable to employee contributions shall be computed by multiplying the total residual assets by a fraction— ... (2) The denominator of which is the present value of all benefits assigned to priority categories 2 through 6, pursuant to §§ 2618.12 through 2618.16.

As was the case with computing the numerator, in the absence of a regulatory directive, the determination of the denominator requires allocating withdrawals and distributions proportionately between employee and employer contributions.

does not authorize award of expert witness fees in excess of those allowed under 28 U.S.C. § 1821); *Gray v. Phillips Petroleum Co.,* 971 F.2d 591, 595 (10th Cir.1992) (fee shifting provision of ADEA, 29 U.S.C. § 626, does not authorize award of expert witness fees greater than those allowed under 28 U.S.C. § 1821). ERISA's fee shifting provision accords the decision to the district court's discretion. In addition, expert fees are not part of "reasonable attorney's fees." *West Virginia Univ. Hosps., Inc.,* 499 U.S. at 97–101, 111 S.Ct. at 1146–48. Nor does 42 U.S.C. § 1988 authorize or mandate an award of expert fees in this case. Section 1988 is limited to suits brought under specific civil rights statutes; ERISA is not included. Accordingly, § 1988 is inapposite. *See Watkins v. Fordice,* 807 F.Supp. 406, 418 n. 24 (S.D.Miss.1992), *appeal dismissed,* —— U.S. ——, 113 S.Ct. 1573, 123 L.Ed.2d 142 (1993).

Thus, on remand, should the district court award attorney's fees and costs to plaintiffs, the fees of experts will be limited in accordance with the above discussion.

### D. Attorney's Fees

Retirees also argue that the award of attorney's fees by the district court constituted an abuse of discretion, as the court failed to assign hourly rates in any consistent manner within the same law firm.

The district court did not abuse its discretion in not increasing plaintiffs' award of attorney's fees. Retirees failed to present evidence that the hourly rate awarded was not comparable to attorney's fees awarded in the jurisdiction involving litigation of the same complexity.

However, because the award to plaintiffs will necessarily be reduced on remand, the assessment of costs and attorney's fees should be reviewed and adjusted, if necessary, on remand.

### III. CONCLUSION

The district court properly determined that the 1953 Plan authorized Amalgamated

to receive residual assets that were due to erroneous actuarial computation. However, despite commendable efforts to effectuate ERISA's equitable distribution mandate, the district court did commit error in determining and computing those assets attributable to mandatory employee contributions, and consequently, Amalgamated's reversionary interest. Accordingly, we remand to the district court for further proceedings on the proper distribution between the parties of the residual funds. We presume that the actuarial computations will encompass a limited area of change from the presumptive method presented by Amalgamated focusing on modified figures resulting from the erroneous treatment of prior pension payments coming solely from employee funds, rather than proportionately from employer and employee contributions.[18]

Finally, if on remand the district court again allows plaintiffs attorney's fees and costs, it shall also add an award of attorney's fees and costs to plaintiffs in an appropriate amount for partial success in defending the cross-appeal. Otherwise, plaintiffs shall have 50% of their taxable costs on this appeal.

Reversed and remanded.

### ORDER ON REHEARING

#### Filed June 13, 1994

We have for consideration a petition for rehearing before the panel by the plaintiffs/appellees/cross-appellants, Jack R. Holland, et al. The panel denies that petition.

We also have for consideration a petition for rehearing with a suggestion for rehearing en banc presented to us by The Amalgamated Sugar Company and The Amalgamated Sugar Company Retirement Plan Committee, defendants/appellants. The panel denies that petition for rehearing for the reasons stated below.

█ According to Amalgamated, ERISA Section 4044(b)(5) [29 U.S.C. § 1344(b)(5)],

---

18. We add this observation. District courts in future cases presenting such application of complex accounting to the prolix and arcane regulations of ERISA should consider requesting the PBGC to file an amicus brief aiding the court in its analysis of the actuarial and accounting calculations submitted by the parties.

 

which the court failed to cite in its opinion, requires that a participant's "mandatory contributions" must be paid out first on termination of a pension plan such as here involved. Thus, Amalgamated asserts that under approved accounting procedures, practically no employee contributions remain for calculation in the distribution of the residue (excess assets) and that its accounting calculation should be approved.

We reject appellants' contention that 29 U.S.C. § 1344(b)(5) requires reducing the employees' mandatory contributions for purposes of 29 C.F.R. § 2618.31(b) (determining employees' share of residual assets) by those amounts paid out to the participants prior to the spinoff termination, and that the district court thereby erred by failing to apply § 1344(b)(5) accordingly.

In our view, § 1344(b)(5) does not apply in the case of a spinoff termination, but applies only in an ordinary liquidation of an employee-participating pension plan. The rationale of § 1344(b)(5) is to ensure that in an ordinary liquidation, participating employees get back first at least what they paid into the plan. In the case of a spinoff termination, however, where the employer may be eligible to obtain residual assets, application of that provision operates to the detriment of the employees. Accordingly, § 1344(b)(5) does not apply upon the circumstances of this case.

The panel's decision is amended at page 976, with the addition of footnote 15, to clarify that the discussion of computing mandatory employee contributions under the plan at issue is limited to the situation of a spinoff termination.

In accordance with Rule 35(b), Federal Rules of Appellate Procedure, the suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service. No member of the panel and no judge in regular active service on the court having requested that the court be polled on rehearing en banc, Rule 35, Federal Rules of Appellate Procedure, the suggestion for rehearing en banc is denied.